Melissa HOWARD, Respondent,

v.

CITY OF KANSAS CITY,
Missouri, Appellant.

No. SC 90762.

Supreme Court of Missouri,
En Banc.

Jan. 25, 2011.

Rehearing Denied March 1, 2011.

Saskia C.M. Jacobse, Galen Beaufort, Jamie L. Cook, City Attorney's Office, Kansas City, for the City.

Edward D. "Chip" Robertson Jr., Mary D. Winter, Anthony L. DeWitt of Bartimus, Frickleton, Robertson & Gorny PC, Jefferson City, Mark A. Jess, Christie S. Jess, John J. Ziegelmeyer III, Law Offices of Mark A. Jess LLC, Kansas City, for Howard.

ZEL M. FISCHER, Judge.

## I. INTRODUCTION

The City of Kansas City ("the City") appeals a judgment based on a jury verdict awarding compensatory and punitive damages to Melissa Howard for discrimination by the city council ("the council") when it rejected a panel of three Caucasian women nominated for the municipal division of the circuit court because of their race.

The judgment is affirmed.

## II. FACTS AND PROCEDURAL HISTORY

On August 31, 2006, Judge Marcia Walsh retired as a judge of the Kansas City municipal division.[1] The selection of judges for the Kansas City municipal division is mandated by the voter-approved Kansas City Charter (the "charter"). The charter establishes a five-member Municipal Judicial Nominating Commission (the "commission"),[2] which interviews applicants and submits a panel of three qualified persons as nominees for any judicial vacancy to the mayor and city council. The council then makes the final appointment decision from the panel of three by a majority vote. Specifically, the charter provides that "[t]he Council will act to appoint one of the persons nominated by the Commission within sixty days of receipt of the panel from the Commission unless the Council chooses to not fill a vacancy." CHARTER OF KANSAS CITY, MISSOURI § 310 (2006).

Upon Walsh's retirement, the plaintiff, Melissa Howard, applied for the position along with 12 other applicants. From that pool of applicants, the commission nominated three Caucasian women to fill the vacancy. One of those three nominees was Howard. This panel was submitted to the council October 30, 2006. At its meeting November 9, 2006, the council rejected the panel by a 7–6 vote, despite acknowledging that all three panelists were well-qualified

---

1. At the time of her retirement, three of the six judges on the court were minorities and Judge Walsh was the only Caucasian female on the court.

2. The commission consists of five members: the chair, who is the presiding judge of the 16th Judicial Circuit; two attorney members, who are elected by members of The Missouri Bar residing in Kansas City; and two non-attorney members, who are appointed by the mayor. CHARTER OF KANSAS CITY, MISSOURI § 309(c) (2006). The commission may act only by the concurrence of a majority of its members. Id. at § 309(h).

for the judgeship. On December 14, 2006, the council met again to consider the panel and again voted to refuse to select one of the panelists for the vacancy.[3] When the panel expired after 60 days,[4] the commission re-nominated the same three women, but the council again declined to appoint any of the three nominees and again allowed the panel to expire without selecting a panelist to fill the municipal judge vacancy.

Several council members expressed dissatisfaction with the panel because it did not include any minorities. Multiple statements made during the city council meetings, which were open to the public, addressed concerns that the all-Caucasian female panel lacked diversity. Specifically, the following statements were made at the council meetings:

"There is no diversity whatsoever ... within the panel of contestants who have been referred to us."

"I feel as though at this point I'm given ... a very narrow opportunity for selection because I only have a sampling of one demographic of our city and that is Caucasian females."

"[T]he fact remains this panel has no diversity whatsoever ... I move that we reject ... this panel back to the committee and not make a selection at this time."

"For me there is an issue of equity related to racial mix, when you have thirteen candidates and you have six of color and none appear on the panel, it's hard for me to believe that you have six of those candidates of color none of whom would qualify to be in the top three ... I just don't believe that is the case."

"I have a hunch that if this [panel] is returned to the commission that there is a message there."

"All one need do is look at the numbers, race matters in America, it matters in the State of Missouri and it matters in the city of Kansas City."

"We need to send this panel back and show that this city, of Kansas City, is fair in its diversity practices" because "this [panel] does not reflect the diversity of Kansas City."

"When we talk about diversity, do we include gender?"

"If there were three qualified black candidates on this panel, I would not be voting to reject the panel because they ... did not represent the exact demographics of this city" and "this discussion is absolutely ridiculous ... we have three qualified candidates here ... we ought to vote for [one of them]."

"This has nothing to do with your [the panelists'] qualifications ... I think you are certainly qualified."

"We continue to talk about divisiveness ... in terms of race relations ... but the divisiveness took place when the panel was presented."

"It ha[s] nothing to do with their credentials; I think all of them are highly qualified."

"We have been in line for a long time ... a lot of people have been in line ... just to be represented."

3. At this meeting the vote was 6–6 because one council member was absent, but because a majority vote was required to select a panelist no further action was taken.

4. Under the charter, the council has only 60 days after a panel is submitted to appoint the municipal judge or choose not to fill the vacancy. CHARTER OF KANSAS CITY, MISSOURI § 310. An appointment was not made from the panel submitted October 30, 2006. The commission resubmitted the same panel on January 9, 2007, and again no appointment was made.

"Diversity ... being an African–American in America it's a whole lot different than you can ever imagine and so you really can't say I understand where you are."

"It's not about these women. Each of these women have gone to college, earned degrees and made a very good life for themselves and have good reputations."

"I think it's a shame ... [and] it may even be illegal for us to sit here and not have the courage to [s]elect a judge today."

"These three women have risen up in a field that is male dominated ... for us to dismiss the diversity they bring to the table is unfortunate ... so I'm disappointed that we don't feel you're [the panel] minority enough—that you're not diverse enough."

Several council members also testified at trial as to the influence that the panelists' race had on the council's decision to reject the panel. One councilman agreed that race "was involved" in the council's refusal to consider the applicants selected by the commission, and another councilman testified that, had the commission placed a minority on the panel of final applicants, he would have voted to consider the panel. Mayor Kay Barnes similarly testified that "race was a factor in [her] decision to reject the panel" and she likely would have voted to select a judge had an African-American candidate been on the panel, despite acknowledging her lack of knowledge as to the commission's interview and selection process.

Howard subsequently brought suit against the City under the Missouri Human Rights Act ("the MHRA").[5] Her petition alleged that the City engaged in an unlawful employment practice during the municipal judge appointment process by refusing to even consider hiring her because of her race.

At trial, Howard testified that she suffered emotional distress due to the actions and statements of the council, many of which were distributed throughout the media, discounting her nomination as a result of her race. She explained that her distress manifested itself in physical ways, as she suffered sudden weight loss, inability to sleep, and would "still get sick to [her] stomach." Howard also testified about her ongoing concern and distress about her career in the future. Her husband further testified that because of the public nature of the council members' statements and because of Howard's position as a county prosecutor, the stress she felt was ongoing and occurred on a nearly daily basis. He also expressed that he had observed the impact this ordeal had on her firsthand, explaining that she had lost weight, could not sleep normally and was uncharacteristically emotional.

The jury in the Platte County circuit court found in favor of Howard and awarded her a total of $633,333 in compensatory damages and $1.5 million in punitive damages. The circuit court entered a judgment awarding Howard's damages as well as attorneys fees and prejudgment interest. The City brings seven points on appeal.

## III. ANALYSIS

### A. Applicability of the MHRA

■ The City argues that the trial court erred in not directing a verdict for the City because the MHRA does not apply to the

---

5. Chapter 213, specifically § 213.055. All statutory references are to RSMo 2000 unless otherwise indicated.

decision made by the city council. It asserts that municipal court judges are not employees under the MHRA and, therefore, the decision to reject the three candidates was not an employment decision. The City presents this issue as a matter of law.

The case was submitted to the jury on an instruction [6] that read:

> Your verdict must be for plaintiff Howard and against defendant City of Kansas City if you believe:
>
> First, defendant limited, segregated or classified plaintiff in a way that deprived or tended to deprive her of employment opportunities with defendant as a municipal judge, and
>
> Second, race was a contributing factor in such limitation, segregation or classification, and
>
> Third, as a direct result of such conduct, plaintiff sustained damages.

The jury is presumed to have found that plaintiff was deprived of "employment opportunities" pursuant to the instruction given. The City does not contest submissibility, but only the proper scope and application of the MHRA. Therefore, the principal issue for this Court is whether a municipal judge, as defined by the city charter, is an "employee" and, if so, whether Howard was an employment applicant under the protection of the MHRA.

■ "The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Farmers' & Laborers' Co-op Ins. Ass'n v. Director of Revenue*, 742 S.W.2d 141, 145 (Mo. banc 1987).

## 1. The MHRA

■ The MHRA protects important societal interests by prohibiting unlawful employment practices on the basis of race, color, religion, national original, sex, ancestry, age, or disability. *State ex rel. Dean v. Cunningham*, 182 S.W.3d 561, 565 (Mo. banc 2006). Specifically, § 213.055 is a remedial prohibition against discrimination in the employment context. The section provides:

> 1. It shall be an unlawful employment practice:
>
> (1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:
>
> (a) To fail or refuse to hire or to discharge any *individual*, or otherwise to discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability;
>
> (b) To limit, segregate, or classify his *employees* or his *employment applicants* in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status and an employee, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability[.]

§ 213.055.1 (emphasis added).

The MHRA defines "employer" to include "the state, or any political or civil subdivision thereof...." Section 213.010(7). The City has conceded that it is an employer covered under the MHRA.

---

**6.** This was Jury Instruction No. 5 in this case, and it was modeled after MAI 31.24 [2005], the pattern jury instruction for an employ- ment discrimination action based on the MHRA.

The MHRA does not define "employee" or "employment applicant." The City argues that municipal judges are public officials and are not "employees" or "employment applicants" within the protection of the MHRA, urging that public officials should be viewed as similar to independent contractors.

### 2. The dictionary definition of "employee"

■ Under traditional rules of statutory construction, undefined words are given their plain and ordinary meaning as found in the dictionary to ascertain the intent of lawmakers. *Asbury v. Lombardi*, 846 S.W.2d 196, 201 (Mo. banc 1993). The word "employee" is commonly defined as "one employed by another, usually in a position below the executive level and usually for wages," as well as "any worker who is under wages or salary to an employer and who is not excluded by agreement from consideration as such a worker." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 743 (1993). To "employ" means "to provide with a job that pays wages or a salary or with a means of earning a living." *Id.* There is no dictionary definition for "employment applicant."

These definitions support a finding that a municipal judge is an employee of the City. Under the charter, the City pays its municipal judges a fixed salary and requires that the judges perform their services exclusively for the City. CHARTER OF KANSAS CITY, MISSOURI §§ 305, 307. Therefore, a municipal judge is "employed . . . for wages" by the City. A municipal judge is likewise "a worker . . . under wages or

salary . . . not excluded by agreement from consideration as such a worker." Under the definition of the verb to "employ," a municipal judge is provided "a job that pays wages or salary."

The only ambiguity in the definitions is the language that provides "usually in a position below the executive level." The term "executive" is defined as "one who holds a position of administrative or managerial responsibility in a business or other organization." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 794. A secondary definition includes those "belonging to a branch of government that is charged with such powers as . . . superintendence of the execution of the laws," which is distinct from the judiciary. *Id.* Although judges have independent decision-making authority regarding the cases they hear, they are not normally considered in the context of above or below the "executive level." This part of the definition simply does not apply. This minor ambiguity in the definition does not disqualify a judge from being an employee when all other portions of the definition of "employee" apply to Kansas City municipal judges.[7]

### 3. The applicability of Sloan v. Bankers Life Insurance and other independent contractor cases

The City urges that common law principles of agency should be applied to determine whether a municipal judge is an "employee" within the scope of the MHRA. Specifically, the City cites to *Sloan v. Bankers Life & Casualty Co.*, 1 S.W.3d 555, 563 (Mo.App.1999). In Sloan, an insurance salesperson sued the company he

---

**7.** Interestingly, the legislature chose to use the term "individual" instead of "employee" in § 213.055.1(1)(a). The term "individual" is defined as "a single human being as contrasted with a social group or institution." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1152. This is a broadly inclusive term. The parties have not argued, and the Court does not consider, whether §§ 213.055.1(1)(a) and 213.055.1(1)(b) establish separate causes of action.

worked for, claiming age discrimination in violation of the MHRA. *Id.* at 560. The issue in the case was whether Sloan should be considered an independent contractor or an "employee" under the MHRA.

Notably, the contract between Sloan and the insurance company expressly stated that he was an independent contractor, he was paid on commissions only, the company did not withhold taxes from his paycheck, nor did the company provide him with an office or supplies. *Id.* at 563. Sloan determined his own schedule, set his own hours, and provided for his own transportation and administrative support at his own expense. *Id.* The court in that case held that, for the reasons stated above, Sloan was an independent contractor; therefore, he lacked standing to bring his discrimination claim because independent contractors are not employees within the meaning of the MHRA. *Id.* at 563–64. Accordingly, *Sloan* does not apply to the facts in this case.

The City also points to *Howard v. Winebrenner,* 499 S.W.2d 389, 395 (Mo.1973), and suggests that the *Winebrenner* eight-factor test designed to gauge the employer's right to control the means and manner of a person's service is appropriate in this case to determine whether Howard is an "employee" covered by the MHRA.[8] *Winebrenner* is a workers' compensation case involving a plaintiff who was hired by the defendant to drive one of defendant's tractors to haul a load of freight. After returning the tractor and while on the defendant's property, as the plaintiff walked to his automobile, he was struck by a tractor

driven by the defendant and was severely injured. *Id.* at 391–92. The Court then had to determine whether the plaintiff was an employee of the defendant to assess whether the plaintiff's injuries arose out of the course of his employment such that his exclusive remedy was under Missouri workers' compensation law. *Id.* at 395–96. The Court in *Winebrenner* held that an employee-employer relationship existed between the plaintiff and defendant and that the plaintiff's injury arose out of and in the course of his employment. *Id.* at 396.

With the exception of *Sloan,* almost all cases in Missouri that apply this common law analysis to distinguish employees from independent contractors are concerned with workers' compensation coverage or *respondeat superior* liability. *See, e.g., Ascoli v. Hinck,* 256 S.W.3d 592, 594 (Mo. App.2008) (vicarious liability); *Leach v. Board of Police Comm'rs of Kansas City,* 118 S.W.3d 646, 649 (Mo.App.2003) (workers' compensation). Whether an individual is an employee for purposes of receiving workers' compensation benefits or for purposes of holding the employer liable for its tortious acts involves different considerations than whether an individual is entitled to protection as an employee under the MHRA.

Independent contractors are typically hired to complete a specific task, use their own tools in completing their work, are paid a fixed sum on a by-the-job basis, and are not provided with benefits. Missouri has no statutory definition of the term

---

**8.** The Court in *Winebrenner,* in addressing whether an employee-employer relationship existed for purposes of Missouri workers' compensation law, stated:

The right of control is affected by such things as [1] extent of control, [2] actual exercise of control, [3] duration of employment, [4] right to discharge, [5] method of payment for services, [6] furnishing of equipment, [7] whether the work is part of the regular business of the employer, and [8] the contract of employment, none of which is in itself controlling, but each may be considered relevant to the issue.

499 S.W.2d at 395.

"independent contractor." This Court has generally described an independent contractor as "one who contracts to perform work according to his own methods without being subject to the control of his employer except as to the result of his work." *State ex rel. MW Builders, Inc. v. Midkiff,* 222 S.W.3d 267, 270 (Mo. banc 2007).

Kansas City municipal judges are employed on a full-time basis, provided the necessary supplies and work space they need, and paid a regular salary that includes benefits. While judges must be free from the control of their employer "as to the result" of their work, judges are required to follow the law, show up when scheduled, and are subject to removal under certain circumstances. Kansas City municipal judges are not independent contractors as that term is generally understood.[9]

### 4. The City has designated municipal judges as employees

While the City argues that municipal judges are not "employees," evidence in this case suggests that these judges are treated as City employees. Here, as opposed to the insurance salesman in *Sloan,* municipal judges are at no point expressly designated to be "independent contractors." To the contrary, they are repeatedly referred to as an "employee" on various forms they are required to fill out and sign upon being hired. These employment forms require both the judges' signatures as "employees" and their "employee" identification number, and several of these forms must then be sent to the City's human resources department to be placed in the judges' "personnel" files. The following examples highlight the various ways in which the City assigns an employee status to its municipal judges:

- On one form in particular, each judge must sign and state: "As an active *employee* of the City of Kansas City, Missouri, I hereby designate the following as my pension beneficiaries."

- Another form explains that the 10-day enrollment period for insurance starts to run the day after the municipal judge's first day of "employment" with the City.

- Kansas City municipal judges are eligible for life insurance under a group policy with the City and, as such, they are deemed to meet both the "member" and "active work" requirements of the policy, defined as "[a]n active *employee* of the employer regularly working at least 40 hours each week" who "perform[s] the material duties of [one's] own occupation at [one's] employer's usual place of business."

- The City pays its municipal judges a fixed salary, which has no relation to the number of cases tried before the judge, guilty verdicts reached, or fines imposed or collected by the judge. CHARTER OF KANSAS CITY, MISSOURI § 305; § 479.020.6 RSMo Supp.2009.

- The City requires that its full-time municipal judges perform their services exclusively for the City. CHARTER OF KANSAS CITY, MISSOURI § 307 (prohibiting municipal judges from "engag[ing] in the private practice of law").

- The City treats its municipal judges as "employees" for federal and state tax withholding purposes.

---

9. Persons engaged in the following occupations are often regarded as independent contractors: architects, brokers, painters and attorneys. *See* 41 Am.Jur.2d, *Independent Contractors* § 22.

■ The City also provides its judges with the work space, staff, and office equipment necessary for them to perform their duties.

All of these factors run counter to any assertion that the judges are independent contractors and further emphasize why the common law analysis applied in independent contractor cases simply does not fit. Despite the City's lack of control of judicial decision-making, these facts, taken as a whole, support a legal determination that municipal judges are employees of the City.

## 5. Conflicting precedent from Texas, Tennessee and Kentucky

Courts in three other states have previously been called on to construe their respective state's human rights laws to determine whether a public official is an "employee." They have split on the issue. A Texas Court of Appeals and the Tennessee Supreme Court have held that a judge, as a public official, is not an employee, while the Kentucky Court of Appeals has found that public officials are "employees."

In *Thompson v. City of Austin,* two municipal court judges who were not reappointed by the Austin city council upon expiration of their initial two-year terms brought suit under the Texas Commission on Human Rights Act (TCHRA) claiming they were discriminated against because of their respective disabilities. 979 S.W.2d 676, 679 (Tex.App.1998). The Texas appellate court held that judges were public officials and therefore were not protected as employees under the TCHRA.[10] *Id.* at

682. That conclusion stemmed primarily from the court's application of a federal common law test that suggested a lack of control by the city council over the "means and manner" of municipal judges' performance of their duties. *Id.*

However, the Texas legislature expressly intended for the TCHRA to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964." TEX. LAB. CODE ANN. § 21.001(1). As such, the Texas court in *Thompson* felt inclined to examine federal case law for guidance and apply federal common law agency doctrine. 979 S.W.2d at 681 n. 5. The federal common law test applied by the court in *Thompson* originated from cases construing Title VII, which explicitly defines "employee" and includes within that definition an exception for various public officials. Under the federal Civil Rights Act (Title VII), public officials clearly are not employees because 42 U.S.C. § 2000e(f) states:

> The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

The Tennessee Supreme Court in *Bredesen v. Tenn. Judicial Selection Comm'n* adopted the reasoning of *Thompson* and applied a similar common law factor test[11]

10. The TCHRA is substantially similar to the MHRA, but the TCHRA does include a definition of "employee" that provides an exception for "an individual elected to public office." *See* Tex. Lab.Code Ann. §§ 21.051, 21.002(7). That exception, however, does not factor into

the court's holding in *Thompson,* as the judges at issue were not elected.

11. The *Thompson* court applied a "hybrid economic realities-common law control test" generally used to distinguish between employees and independent contractors, as previous-

to find that nominees to fill a judicial vacancy were not employees for purposes of the Tennessee Human Rights Act (THRA).[12] 214 S.W.3d 419, 432 (Tenn. 2007). The THRA, however, unlike the MHRA, but similar to the Texas Act, includes an express provision explaining its purpose and intent is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Act...." TENN.CODE ANN. § 4–21–101(a)(1). The *Bredesen* court, therefore, also found it necessary to interpret the THRA consistently with Title VII and relied heavily on the definition of "employee" found in Title VII and its exclusion of certain public officials. 214 S.W.3d at 430.

In a related case, the Kentucky Court of Appeals reached a contrary holding. It held that an elected mayor and elected commissioners were "employees" for purposes of the Kentucky Civil Rights Act (KCRA) despite being public officials. *Kearney v. City of Simpsonville*, 209 S.W.3d 483 (Ky.App.2006). In reaching its conclusion, the court noted that the KCRA did not exclude public officials from the definition of "employee"[13] and found it important that the KCRA is meant to be interpreted broadly to best achieve its anti-discriminatory goals. *Id.* at 485–86.

The Missouri General Assembly chose not to include a definition for "employee," as provided by Title VII, and expressed no purpose of the MHRA to embody Title VII as did the legislatures in Texas and Ten-

nessee. The Missouri language is more like that of the Kentucky Civil Rights Act, making *Kearney v. City of Simpsonville* the more persuasive precedent. In fact, this Court previously has acknowledged that "Missouri's discrimination safeguards under the MHRA, ... are not identical to the federal standards and can offer greater discrimination protection." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818–19 (Mo. banc 2007). By not defining "employee," our legislature chose to omit the "public official" exception. For that reason, the rationale underlying the decisions in *Thompson* and *Bredesen* is not persuasive in this case.

### 6. Conclusion

■ A Kansas City municipal judge is an employee or an employment applicant under the MHRA. Because the City did not challenge submissibility, the question of whether Howard was actually deprived of an employment opportunity because of her race is not before us.

This Court would note that diversity is an honorable goal. In fact, Rule 10.32(f), governing Missouri's judicial commissions provides:

> The commission shall actively seek out and encourage qualified individuals, including women and minorities, to apply for judicial office. The commission shall further take into consideration the desirability of the bench reflecting the racial and gender composition of the communi-

---

ly applied in *Guerrero v. Refugio County*, 946 S.W.2d 558, 566 (Tex.App.1997), to determine whether an elected county auditor was an "employee" under the TCHRA. The *Bredesen* court applied a substantially similar common law agency test originally designed "to determine whether a hired party is an independent contractor or an employee." *See Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004). The substantive differences between these two tests are minimal. *Id.*

**12.** The Tennessee Human Rights Act contains language substantially similar to the MHRA and does not include a definition of the term "employee." *See* TENN.CODE ANN. § 4–21–401(a).

**13.** Under the KCRA, an "employee" is defined simply as "an individual employed by an employer." KY.REV.STAT. ANN. § 344.030(5).

ty. Each commission member, however, shall cast his or her votes solely in accordance with the relative merits of the applicants so as to select the three best qualified nominees.

This rule requires that the commissions actively "seek out and encourage ... women and minorities to apply for judicial office." The commissions are further charged to "take into consideration the desirability of the bench reflecting the racial and gender composition of the community." This is to be distinguished from the provisions of § 213.055.1(1)(b) of the MHRA, which prohibit deprivation of any employment opportunity because of an "individual's race, color, religion, national origin, sex, ancestry, age or disability[.]"

## B. Admissibility of McLarney's Testimony

■ The City argues "[t]he trial court erred in admitting testimony of a third party regarding the lawfulness of the City Council's decision because the testimony of the third party was improper opinion testimony in that it was evidence regarding an ultimate issue of law." Patrick McLarney, an attorney in private practice in Kansas City, testified that he had made the council aware that "to reject [the panel] simply because of lack of a minority was discrimination and illegal in [his] opinion."

■ Generally, "the opinion of an expert on issues of law is not admissible." *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133, 153 (Mo.App.1992) (citing *Young v. Wheelock*, 333 Mo. 992, 64 S.W.2d 950, 957 (1933), *overruled on other grounds by Executive Bd. of Missouri Baptist Convention v. Carnahan*, 170 S.W.3d 437 (Mo.App.2005)). This is because such testimony "encroaches upon the

duty of the court to instruct on the law." *Wulfing*, 842 S.W.2d at 153.

The trial court, however, did not rule the testimony admissible as an expert opinion but, rather, specifically ruled that this testimony was admissible for purposes of rebutting the testimony given by an earlier witness. The mayor had previously testified that she did not know whether it was illegal for an employer to make employment decisions on the basis of race. McLarney was then allowed to testify that he had notified Mayor Barnes and certain members of the city council that, in his opinion, their rejection of the panel based on racial considerations was illegal in order to refute the mayor's testimony that she was unaware it was unlawful to consider race when making an employment decision.

■ It is established law that "[a]ny competent testimony that tends to explain, counteract, repel or disprove evidence offered by [one party] may be offered in rebuttal." [14] *State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999). "When a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible." *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir.2005); *see also Union Elec. Co. v. Metropolitan St. Louis Sewer Dist.*, 258 S.W.3d 48, 57 (Mo. banc 2008). Although Howard called Mayor Barnes as a witness, she was clearly adverse. "A party calling an adverse party as a witness may contradict that person's testimony." *Waters v. Barbe*, 812 S.W.2d 753, 757 (Mo. App.1991).

■ A trial court's decision regarding admissibility of evidence is reviewed only for an abuse of discretion, such as when the ruling is clearly against the logic of the circumstances and is so unreasonable and

---

14. Rebuttal evidence is evidence that attempts to "disprove or contradict" the evidence to which it is contrasted. BLACK'S LAW DICTIONARY 529 (7th ed.1999).

arbitrary that the ruling shocks the sense of justice and indicates a lack of careful, deliberate consideration. *Nelson v. Waxman*, 9 S.W.3d 601, 603–04 (Mo. banc 2000). Here, it was not an abuse of discretion for the trial court to allow McLarney to offer rebuttal testimony relating to whether the mayor and council had been notified that in his opinion it was illegal to reject the panel on grounds of race. This testimony may have been appropriate for a limiting instruction at this stage of the proceedings but no such request was made. This testimony was relevant to the issue of punitive damages to be discussed later.

## C. Admissibility of Evidence Regarding Howard's Background

▪ The City claims it was error for the trial court to refuse to admit evidence from certain council members that would have been probative as to a non-race-based motive behind their decision to reject the panel. Specifically, the trial court ruled that the City could not offer testimony about an unsubstantiated story in a blog about Howard's past that allegedly raised concerns for at least two of the council members who voted to reject the panel.

▪ A court may exclude evidence that may have a prejudicial effect, even though the evidence is logically relevant, when the risk of unfair prejudice outweighs the probative value. *State v. Wolfe*, 13 S.W.3d 248, 262 (Mo. banc 2000), *overruled on other grounds by Mitchell v. Kardesch*, 313 S.W.3d 667 (Mo. banc 2010). It has been well established that "[t]he admissibility of evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion." *Mitchell*, 313 S.W.3d at 674–75. "This standard gives the trial court broad leeway in choosing to admit evidence, and . . . [i]n part, such broad leeway is granted

to ensure that the probative value of admitted evidence outweighs any unfair prejudice." *Id.*

The evidence at issue was unconfirmed hearsay. During the City's offer of proof, its witnesses admitted that they did not have any personal knowledge as to whether the information about Howard was true. Moreover, the evidence at issue relates only to Howard and had nothing to do with the other two panelists. Therefore, regardless of whether certain council members had concerns about Howard, these concerns did not extend to the other panelists. The council's rejection of the entire panel does not support a claim that the council's decision was motivated by a concern that Howard was not a suitable candidate.

## D. Punitive Damages

▪ The City argues that the trial court erred by instructing on punitive damages because punitive damages are not specifically available against municipalities under the MHRA and because the evidence did not show the City acted willfully, wantonly, outrageously or with reckless disregard for the rights of others. The jury was instructed:

> If you find the issues in favor of plaintiff, and if you believe the conduct of defendant as submitted in Instruction Number 5 was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in Verdict A, you may find that defendant is liable for punitive damages.

> If you find that defendant is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of trial.

The City argues the language of the MHRA does not override the general rule that "in the absence of a statute specifical-

ly authorizing such recovery, punitive or exemplary damages are not recoverable against a municipal corporation." *Chappell v. City of Springfield*, 423 S.W.2d 810, 813 (Mo.1968). Howard argues that § 213.111.2 provides that "actual and punitive damages" are available against all employers and § 213.010(7) defines "employer" to include a municipality.

There is a conflict in the reported cases that have dealt with this issue. This Court has not ruled on this issue previously. However, our Missouri court of appeals has held uniformly that municipalities and other political or civil subdivisions are liable for actual and punitive damages under the MHRA just like any other employer defined in the statute. Section 213.111.2 and 213.010(7). *Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 108 (Mo.App.2006); *H.S. v. Board of Regents, Southeast Missouri State University*, 967 S.W.2d 665, 672–73 (Mo.App.1998).

The City relies on *Kline v. City of Kansas City*, 175 F.3d 660 (8th Cir.1999), which acknowledged that statutory language specifically provided for punitive damages against municipalities when the above statutes were read in conjunction with one another. However, the court in *Kline* held "the MHRA is a voluminous statute with many provisions and definitions. We believe that a result cobbled together from different sections of the statute is insufficiently explicit under the Missouri Cases to overcome the presumption against punitive damages when a municipality is a defendant that has been found liable." *Id.* at 670 (internal statutory citations omitted).

That same year, a contrary holding was made by a federal court in *Fortner v. City of Archie*, 70 F.Supp.2d 1028 (W.D.Mo. 1999). In response to the Kline decision stating that the MHRA was "voluminous"

and that a result should not be "cobbled together," the court in *Fortner* stated:

It is the experience of this Court, however, that all legislative bodies use a definition section to make the drafting of the substantive law easier to follow without having to repeat the definition. Assuming this to be true, it would appear that the inclusion of "political or civil subdivision" by the Missouri General Assembly in the definition of employer would subject them to the same damages as any other employer.

*Id.* at 1031.

 This Court's determination of whether punitive damages are allowable under the MHRA is not a policy decision, but rather one of statutory interpretation. The rules of statutory interpretation are not intended to be applied haphazardly or indiscriminately to achieve a desired result. Instead, the canons of statutory interpretation are considerations made in a genuine effort to determine what the legislature intended. This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue. *Parktown Imports, Inc. v. Audi of America, Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009). "If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then we are bound by that intent and cannot resort to any statutory construction in interpreting the statute." *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 161 (Mo.App.2006).

The court of appeals in *Brady* correctly pointed out that in *Chappell* this Court states, "[i]t is the general rule that in the absence of a statute specifically authorizing such recovery, punitive or exemplary damages are not recoverable against a municipal corporation." 213 S.W.3d at 108

(citing *Chappell,* 423 S.W.2d at 813). In *Chappell,* there was no statute authorizing a punitive damage award against a municipality because of the operation of a sewage disposal plant that constituted a nuisance. The court of appeals in Brady also correctly pointed out: "[u]nlike *Chappell,* here there is a statute specifically authorizing [punitive damages]." *Id.* at 108.

Because the Missouri General Assembly has not amended or clarified the MHRA in the face of our court of appeals decisions authorizing punitive damages against political subdivisions and because the Missouri General Assembly included the phrase "the state, or any political or civil subdivision" in the definition of "employer" in § 213.010, it is clear the legislature intended to treat the state and its subdivisions in the same manner as it treats other employers.

A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted "either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." *Werremeyer v. K.C. Auto Salvage Co.,* 134 S.W.3d 633, 635 (Mo. banc 2004). The defendant must have intentionally committed a "wrongful act without just cause or excuse." *Downey v. McKee,* 218 S.W.3d 492, 497 (Mo.App.2007); *Hoyt v. GE Capital Mortgage Servs., Inc.,* 193 S.W.3d 315, 322 (Mo.App.2006).

Whether there is sufficient evidence for an award of punitive damages is a question of law. We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. In doing· so, we view the evidence and all reasonable inferences in the light most favorable to submissibility. A submissible case is made if the evidence and the inferences drawn therefrom are suffi-

cient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Brady,* 213 S.W.3d at 109 (citing *Hoyt,* 193 S.W.3d at 322).

There were many statements made that the council rejected the panel because it lacked racial diversity. Among them:

Howard's testimony that "[t]here was a meeting with Alvin Brooks wherein he asked me why I would apply since I wasn't black. That I found particularly offensive."

Mayor Barnes's testimony that race was a factor in her decision to reject the panel: "Mayor, race was a factor in your decision to reject the panel of candidates in November and December of 2006, correct?" "Yes."

"There is no diversity whatsoever ... within the panel of contestants who have been referred to us."

And the councilmen's testimony that:

"I feel as though at this point I'm given ... a very narrow opportunity for selection because I only have a sampling of one demographic of our city and that is Caucasian females."

"[T]he fact remains this panel has no diversity whatsoever ... I move that we reject ... this panel back to the committee and not make a selection at this time."

"For me there is an issue of equity related to racial mix, when you have thirteen candidates and you have six of color and none appear on the panel, it's hard for me to believe that you have six of those candidates of color none of whom would qualify to be in the top three ... I just don't believe that is the case."

"We need to send this panel back and show that this city, of Kansas City, is fair in its diversity practices" because "this [panel] does not reflect the diversity of Kansas City."

"If there were three qualified black candidates on this panel, I would not be voting to reject the panel because they ... did not represent the exact demographics of this city" and "this discussion is absolutely ridiculous ... we have three qualified candidates here ... we ought to vote for [one of them]."

"This has nothing to do with your [the panelists'] qualifications ... I think you are certainly qualified."

"It ha[s] nothing to do with their credentials; I think all of them are highly qualified."

"These three women have risen up in a field that is male dominated ... for us to dismiss the diversity they bring to the table is unfortunate ... so I'm disappointed that we don't feel you're [the panel] minority enough—that you're not diverse enough."

Furthermore, testimony was adduced at trial that the council members were advised that failing to choose from among the panel because of race was illegal. Attorney McLarney testified that he notified Kansas City's attorney that what the City was doing with regard to the vacancy was "discriminating against white females" and was illegal. McLarney also testified that he said the same thing to numerous council members, including Councilman Skaggs, Councilman Brooks, Councilman Eddy, Councilman Glover and Councilman Riley. McLarney stated that he was

> making the councilmen aware that in rejecting the panel because there was not a minority on it was illegal in my opinion and I repeatedly told them on many occasions and went out of my way to talk to them because I felt they need-

ed to fill somebody on that panel and they had a very good panel and there was no reason to reject it particularly when they were replacing another Caucasian female and you had three very well qualified Caucasian females. To reject it simply because of lack of a minority was discrimination and illegal in my opinion.

Based on this evidence, it is clear that there was sufficient evidence to support the submission of punitive damages to the jury in this case.

### E. Jury Instruction as to Future Damages

 The City argues "[t]he trial court erred in instructing the jury on future damages because future damages were not supported by the evidence in that there was no evidence that [Howard] was reasonably certain to sustain damage in the future." Specifically, Instruction No. 6 read:

> If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

This instruction was modeled after MAI 4.01 [2002 Revision]. The trial court did not submit an alternative instruction offered by the City that read as follows:

> If you find in favor of Plaintiff Melissa Howard, then you must award ·Plaintiff such sum as you believe will fairly and justly compensate Plaintiff for any damages you believe Plaintiff sustained as a direct result of the occurrence mentioned in the evidence.

 ██ Instructional error is reviewed *de novo. Harvey v. Washington,* 95

S.W.3d 93, 97 (Mo. banc 2003). The verdict will be reversed only if the party claiming instructional error establishes that the instruction at issue misdirected, misled, or confused the jury, resulting in prejudicial error. *Id.*

To the extent that this point attempts to challenge the instruction given, the claim of error has not been preserved. Rule 70.03 instructs that "[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." "Timely objections [to an instruction] are required as a condition precedent to appellate review in order to afford the trial court an opportunity to correct any mistakes immediately and inexpensively without risking the delay and expense of an appeal and a retrial." *Gomez v. Construction Design, Inc.*, 126 S.W.3d 366, 371 (Mo. banc 2004). There is no record of the City making an objection to Instruction No. 6 at trial. Notably, there is a record of the City objecting to three other instructions (Instruction Nos. 4, 5 and 7), and providing grounds for those objections.

To the extent that the City did submit an alternative version of the instruction, which the trial court refused, the City could have raised an issue regarding the trial court's failure to give the alternative instruction, but it did not do this either. There is nothing in the record indicating the City objected at trial to the court's failure to give its alternative instruction. Moreover, the City failed to preserve in its motion for new trial any issue regarding the court's refusal to give the City's version of the instruction.

To the extent that this point challenges submissibility, this claim of error also was not preserved. Rule 72.01(a) mandates "[a] motion for a directed verdict shall state the specific grounds therefor."

To preserve a question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence and, in the event of an adverse verdict, an after-trial motion for a new trial or to set aside a verdict must assign as error the trial court's failure to have directed such a verdict.... [However], a motion for directed verdict that does not comply with the requirements of Rule 72.01(a) neither presents a basis for relief in the trial court nor preserves the issue in the appellate court.

*Pope v. Pope*, 179 S.W.3d 442, 451 (Mo. App.2005). *See, e.g., Johnson v. Allstate Indem. Co.*, 278 S.W.3d 228, 233 (Mo.App. 2009) (holding defendant's claim of insufficient evidence to find him negligent for defamatory statements against plaintiff was not preserved for appeal where it was not raised as a specific ground in its motion for directed verdict); *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 163–64 (Mo.App.1997) (holding that because defendant's motions for directed verdict did not raise the issue of submissibility of aggravating circumstances they failed to preserve that issue for appellate review). Where an insufficient motion for directed verdict has been made, a subsequent post-verdict motion is without basis and preserves nothing for review. *Pope*, 179 S.W.3d at 451.

The City's motion for a directed verdict against Howard set forth the following grounds:

1. The MHRA does not apply to the decisions made by the Kansas City Council because they were not employment decisions.

2. The evidence fails to prove that Plaintiff was discriminated against on

the basis of her race when the City Council failed to appoint her to the vacancy in Division 205 of the Municipal Division of the Sixteenth Circuit of Jackson County.

3. The evidence fails to prove that Plaintiff was retaliated against because she filed a charge of discrimination with the Missouri Commission on Human Rights.

4. Plaintiff is not entitled to punitive damages, and has not put forth sufficient evidence to support an instruction for punitive damages.

As shown, the City's motion for directed verdict contains no language relating to the sufficiency of the evidence regarding future damages. Accordingly, the motion does not state the specific grounds that are now asserted by the City on appeal that "future damages were not supported by the evidence in that there was no evidence that [Howard] was reasonably certain to sustain damage in the future." In fact, the word "future" does not appear once in the motion. Because the City did not argue against the submissibility of future damages in its motion for directed verdict, it has failed to preserve the issue for appeal.[15]

## F. Jury's Verdict as to Compensatory Damages

The City states, "The trial court erred in upholding the jury verdict on damages because the evidence did not support the compensatory damages awarded in that [Howard] was not entitled to front pay or back pay." This point falls short of the requirements of Rule 84.04(d)(1). Review

is gratis only to the extent the Court can understand the City's argument.

■■■■■■■ The City appears to argue this point in two ways. First, it asserts that the verdict is not supported by the evidence because Howard linked emotional distress to lost wages in her closing argument, and, second, it asserts that the trial court erred in failing to grant remittitur.

■■■■■ To the extent the City complains of the manner in which Howard's counsel argued the evidence, no objection was made at that time.

Failure to properly object to closing argument at the time it is made to a jury results in a waiver of any right to complain of the argument on appeal, even if the point is preserved in an after trial motion ... because if the objection is not timely, the trial court has no opportunity to take corrective action at the time the remarks were made.

*State v. Hall,* 319 S.W.3d 519, 523 (Mo. App.2010); *see also Pollard v. Whitener,* 965 S.W.2d 281, 288 (Mo.App.1998) ("It is a settled principle of Missouri trial practice that to preserve trial court error it is necessary to give the trial court the first opportunity to correct the error, without the delay, expense, and hardship of appeal and retrial.").

■■■■■ To the extent the City complains that the trial court did not order remittitur, or that this Court should do so in its place, that argument simply is not preserved in the point relied on or adequately developed and supported in the City's brief. An appellate court should exercise its power to interfere with the judgment of the jury and trial court with hesitation and

---

15. The City also failed to expressly include the submissibility of future damages as an issue among the points listed in its motion for new trial. In the City's brief, supporting its motion for new trial, it does mention that future

damages should not have been submitted, but because the City did not first preserve this issue in its motion for directed verdict, it is not necessary to address the adequacy of the City's motion for new trial on this issue.

only when the verdict is manifestly unjust. *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 249–50 (Mo. banc 2001). The City has not established that the verdict was manifestly unjust.

### G. Attorneys' Fees Award

■ The City argues the trial court erred in awarding the amount of attorneys' fees Howard requested. Specifically, the City contends that the attorneys fees awarded included fees incurred by Howard's prior counsel in a different case filed against the City.[16] The City made this same complaint in a post-trial proceeding, and upon the court's request, Howard's counsel submitted an amended request excluding any fees that may have related solely to Howard's other case. Ultimately, the trial court based its decision to award attorneys' fees on the amended fee application, which was limited to fees incurred in this case.

■ "The trial court is considered an expert at awarding attorney's fees, and may do so at its discretion." *Weissenbach v. Deeken*, 291 S.W.3d 361, 362 (Mo.App. 2009). "To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Russell v. Russell*, 210 S.W.3d 191, 199 (Mo. banc 2007). The City has failed to demonstrate an abuse of discretion in the trial court's award of attorneys fees based on the amended fee application.

### IV. CONCLUSION

The judgment is affirmed.

16. Brian Nicewanger represented Howard in a separate case filed against the City before this case was filed, challenging the constitutionality of a city ordinance. The City argues

TEITELMAN, RUSSELL, and WOLFF, JJ., and BAKER and CRANE, Sp.JJ., concur.

PRICE, C.J., concurs in part and dissents in part in separate opinion filed.

Breckenridge and STITH, JJ., not participating.

WILLIAM RAY PRICE, JR., Chief Justice, opinion concurring in part and dissenting in part.

I concur in the principal opinion, except the punitive damages award. In *Chappell v. City of Springfield*, this Court set forth the general rule that "in the absence of a statute *specifically* authorizing such recovery, punitive or exemplary damages are not recoverable against a municipal corporation." 423 S.W.2d 810, 813 (Mo.1968) (emphasis added). The Court explained that "[p]unitive damages, in this state as in others, are awarded for the purpose of inflicting punishment for wrongdoing, and as an example and deterrent to similar conduct," but "the underlying justification and purpose of punitive damages . . . is not applicable when applied to a municipal corporation." *Id.* at 814.

> One of the principal reasons advanced by the courts why punitive damages should not be recoverable against a municipality, in the absence of specific legislative authority, is that to permit such recovery would contravene public policy. The reasoning is that since punishment is the objective, the people who would bear the burden of the punishment—the tax paying citizens—are the same group who are supposed to benefit from the public example which the punishment makes of the wrongdoer.

that the amount of Nicewanger's fees should be limited to only that which is clearly related to this case.

*Id.* This analysis has also been set out by the United States Supreme Court. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("[P]unitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill.").

The majority has ruled that section 213.111.2 of the MHRA, which provides "actual and punitive damages" are available against an employer, should be read along with section 213.010(7) that defines an "employer" to include a municipality. By combining the language of these two sections, the majority finds that the MHRA authorizes punitive damages against municipalities.

I disagree. The presumption is that punitive damages are not available against municipalities unless the statute *specifically* provides otherwise. The combination of the statutory definition of an employer and the separate statutory section allowing a court to award damages, including punitive damages, to a prevailing party, does not equate to the specificity necessary to overcome this longstanding and well-reasoned presumption.

This is precisely the rationale set out by the Eighth Circuit in *Kline v. City of Kansas City,* holding that the MHRA did not overcome the presumption against awarding punitive damages against municipal defendants. 175 F.3d 660, 670 (8th Cir.1999).

> [T]he MHRA is a voluminous statute with many provisions and definitions. We believe that a result cobbled together from different sections of the statute is insufficiently explicit under the Missouri cases to overcome the presumption against punitive damages when a munic-

ipality is a defendant that has been found liable.

*Id.* For a statute to specifically provide for the imposition of punitive damages against a municipality or other governmental entity it must do so clearly and expressly in a single section, uninterrupted by other statutory provisions.

I would reverse the judgment with respect to punitive damages.