

# SUPREME COURT OF MISSOURI
## en banc

CITY OF HARRISONVILLE,        )     *Opinion issued August 23, 2016*
)
           Appellant-Respondent,    )
)
    v.                                )     No. SC94115
)
McCALL SERVICE STATIONS d/b/a  )
BIG TANK OIL, et al.,         )
)
           Respondent-Appellant,    )
)
THE MISSOURI PETROLEUM      )
STORAGE TANK INSURANCE FUND,  )
)
           Respondent-Appellant.     )

### APPEAL FROM THE CIRCUIT COURT OF CASS COUNTY
**The Honorable Jacqueline A. Cook, Judge**

PER CURIAM

      The City of Harrisonville filed a petition for damages against McCall Service Stations d/b/a Big Tank Oil, Fleming Petroleum Corporation, and the Missouri Petroleum Storage Tank Insurance Fund after the City discovered that petroleum from a service station's underground storage tank had leaked and contaminated the soil where the City was working on a sewer upgrade project. The City alleged counts of nuisance and trespass against McCall, the service station's previous owner, and Fleming, the service station's current owner. The City also alleged counts of negligent and fraudulent misrepresentation

against the Fund because the increased construction costs resulting from the contamination in the City's sewer easement were not paid from the Fund. The jury returned verdicts in favor of the City on all counts and awarded the City compensatory and punitive damages against McCall, Fleming, and the Fund. The circuit court then remitted the punitive damages awarded against the Fund. McCall, Fleming, and counsel for the Fund appealed. The City cross-appealed from the remittitur of the punitive damages award.

The nuisance and trespass instructions submitted to the jury were not erroneous. McCall and Fleming failed to establish that prejudice resulted from the inclusion of the "consequential damages" language in the nuisance and trespass instructions. McCall and Fleming also failed to establish that the nuisance and trespass instructions gave the jury a roving commission on damages or gave the jury an opportunity to award improper economic damages. Likewise, the circuit court did not err in refusing to remit the compensatory damages awarded against McCall and Fleming in that substantial evidence in the record supported the compensatory damages award. Accordingly, the judgment is affirmed with respect to the damages awarded against McCall and Fleming.

The award of punitive damages against the Fund, however, was erroneous. The City's claims against the Fund are not cognizable under the Fund's enabling statutes. Furthermore, the Fund cannot be liable for its own conduct because the Fund's statutory structure is such that the Fund is merely an account and only its Board of Trustees is responsible for the administration and operation of the Fund. It follows that, because the City failed to allege cognizable claims against the Fund for actual or compensatory damages, it also cannot recover punitive damages against the Fund. Accordingly, the

2

punitive damages award against the Fund is reversed. This Court, however, will not disturb the compensatory damages awarded against the Fund given that counsel for the Fund did not seek relief on appeal from the compensatory damages award. Moreover, because counsel for the Fund failed to raise the argument that the Fund's trustees – not the Fund itself – are the proper parties until after the jury rendered its verdict and because the allegations in the City's petition may state a cause of action against the Fund's Board of Trustees for the actions of its agents, the cause is remanded in the interest of fairness and justice. The judgment against the Fund is affirmed in all other respects.

## I.    Factual and Procedural Background[1]

McCall owned a gas station in Harrisonville that had an underground petroleum storage tank system. In September 1997, McCall discovered that its tank system was leaking and submitted notice of this claim against the Fund. The Fund is a special trust fund created by the legislature, in section 319.129,[2] to provide insurance to service station owners for the cleanup costs associated with spills and leaks from underground petroleum storage tanks. Representatives of the Fund investigated the leak and determined that a significant amount of gasoline had leaked into the soil surrounding McCall's tank system.

McCall and the Board of Trustees for the Fund hired Bob Fine, an environmental engineer, to determine the extent of the leak. In October 1997, Mr. Fine notified the Department of Natural Resources that McCall's leaking tank system had caused petroleum

---

[1] This opinion includes portions of the opinion of the court of appeals without further attribution.

[2] Unless otherwise noted, all statutory citations are to RSMo Supp. 2013.

contamination to migrate offsite toward a nearby creek. Mr. Fine prepared a plan to contain the leak by installing monitoring wells on the streets contiguous to McCall's service station. McCall subsequently sold the service station to Fleming.

In 2003, the City decided to upgrade its sewer system to accommodate its growing population. The City's residents approved a bond issue for the multi-million dollar sewer upgrade project. The City hired George Butler & Associates, a local engineering firm, to design the project and prepare a scope of services so that the construction work could be let for competitive bidding.

Rose-Lan Construction won the bidding process and was engaged by the City to complete the sewer project. During construction, Rose-Lan encountered contaminated soil adjacent to Fleming's service station. Because Rose-Lan did not have expertise in remediation of contaminated soil, it could not complete that portion of the sewer project.

The City notified the department of natural resources of the contaminated soil and was informed that the Fund's Board of Trustees had retained Mr. Fine to monitor the contamination since 1997. The Fund's Board of Trustees then hired Mr. Fine to determine whether gasoline from Fleming's service station was responsible for the soil contamination in the City's sewer easement. Mr. Fine confirmed that the leak from Fleming's underground storage tank was the source of the contamination.

The City began discussions with Mr. Fine regarding the best way to address the contaminated soil and to complete construction of the sewer upgrade project. The City's engineer, Ted Martin, estimated that to completely remove and replace the contaminated soil would cost in excess of $500,000. Mr. Fine, on behalf of the Fund, suggested that a

4

more cost-effective approach would be to leave the contaminated soil in place and install petroleum-resistant pipe and fittings. BV Construction submitted a bid of $190,226.38 to install the petroleum resistant pipe according to Mr. Fine's suggested approach.

Pat Vuchetich, the Fund's third-party administrator, concluded that Mr. Fine and BV Construction's estimate was too high and made efforts to find a cheaper bid. Mr. Vuchetich contacted multiple companies and determined that Midwest Remediation was best suited for the project based on his prior experience with the company. Mr. Vuchetich requested that Midwest Remediation prepare a bid and assisted Midwest Remediation's project manager, Shaun Thomas, in preparing the bid by making suggestions about specific cost items. Midwest Remediation's bid was for $175,161.41, more than $15,000 lower than the bid submitted by BV Construction.

On April 13, 2004, Mr. Vuchetich forwarded Midwest Remediation's bid to Carol Eighmey, the executive director of the Fund's Board of Trustees. Mr. Vuchetich stated that the exposure to the Fund would be $135,571 after subtracting Rose-Lan's estimated costs for the relevant section of pipe that the City would avoid because Rose-Lan would not be constructing that portion of the project. Mr. Vuchetich informed Ms. Eighmey that he would tell the City that Midwest's costs were reasonable.

On April 15, 2004, the City held a meeting for all parties involved in the remediation project. Mr. Vuchetich represented the Fund at the meeting. The City was represented by the City administrator, Dianna Wright, the City attorney, Steve Mauer, and Mr. Martin, the City engineer. Mr. Thomas of Midwest Remediation and William Rextroat of Rose-Lan were also in attendance.

5

At the meeting, Mr. Vuchetich presented Midwest Remediation's bid and informed the City that the bid was reasonable. Mr. Vuchetich also expressed concerns that Rose-Lan's initial bid of $19,061.31 for installing the relevant section of pipe was too low. In response, Rose-Lan revised its bid to $25,138.41. Rose-Lan's revised bid reduced the amount of the contamination-related costs for which the Fund would be responsible. Mr. Vuchetich also stated, on behalf of the Fund, that both the City and George Butler & Associates should share some of the additional costs of the cleanup project based upon their failure to discover the soil contamination before preparing the sewer construction plan. The City responded that the Fund should address those concerns with George Butler & Associates, not with the City. Ms. Wright, Mr. Martin, and Mr. Rextroat left the meeting with the understanding that Mr. Vuchetich, on behalf of the Fund, wanted the City to hire Midwest Remediation for the remediation project and that the City would be reimbursed from the Fund for the cost of Midwest Remediation's work, less the amount that the City would otherwise have paid to Rose-Lan for the affected portion of the sewer project.

Various discussions between the City and Mr. Vuchetich occurred over the following months. Mr. Vuchetich, on at least two occasions, made an offer of $50,000 to the City to settle the Fund's liability. On August 3, 2004, the City authorized Rose-Lan to subcontract with Midwest Remediation to install the petroleum-resistant pipes. The following day, the City's attorney sent a letter to Mr. Vuchetich stating that the City was going forward in reliance on his promise that the Fund would pay the full amount of Midwest Remediation's costs.

6

The City was not reimbursed from the Fund for the costs of Midwest Remediation's work. As a result, the City filed suit against the Fund for fraudulent and negligent representation, alleging that the City had hired Midwest Remediation in reliance on Mr. Vuchetich's promise that the cost of Midwest Remediation's work would be paid from the Fund. The City also asserted claims for nuisance and trespass against McCall and Fleming based on the migration of petroleum contamination from the underground tank system.[3] The City sought compensatory and punitive damages from each defendant.

A jury trial was conducted on the City's claims. During trial, the circuit court granted the City's motion for directed verdict on liability against McCall and Fleming. This left only the issue of damages for jury determination on the City's nuisance and trespass claims against McCall and Fleming and the issue of liability and damages on the City's claims of negligent and fraudulent misrepresentation against the Fund. McCall and Fleming made oral and written motions for directed verdict that were overruled by the circuit court. The Fund made only an oral motion for directed verdict at the close of all evidence that the circuit court also overruled.

The jury returned a verdict for the City on all claims. The jury awarded $172,100.98 in compensatory damages against McCall, Fleming, and the Fund. The jury also awarded $100 in punitive damages against McCall and Fleming and $8 million in punitive damages against the Fund. The circuit court entered its judgment accordingly.

---

[3] In its petition, the City alleged a count of negligence against McCall and Fleming. The City dismissed the negligence count at trial.

7

McCall, Fleming, and counsel for the Fund each filed post-trial motions. Counsel for the Fund argued that the $8 million punitive damages award exceeded the cap on punitive damages in section 510.265.1(2) and that the punitive damages award violated the due process requirements of the United States and Missouri constitutions. In refusing to apply the statutory damages cap, the circuit court found that the City's cause of action accrued before the statutory cap's enactment in 2005. Nevertheless, the circuit court remitted the punitive damages award to $2.5 million on due process grounds. The circuit court overruled the remaining post-trial motions.

McCall, Fleming, and counsel for the Fund appeal. The City cross-appeals the circuit court's remitter of the punitive damages award. After an opinion by the court of appeals, the case was transferred to this Court.[4] Mo. Const. art. V. sec. 10.

## II. The Jury Instructions Were Not Erroneous

In their first point, McCall and Fleming assert that the circuit court erred by submitting instruction Nos. 7 and 9, which pertained to the City's nuisance and trespass claims, respectively, because the instructions erroneously permitted the recovery of consequential damages. "Whether a jury was instructed properly is a question of law this Court reviews *de novo*." *Hervey v. Missouri Dep't of Corrections*, 379 S.W.3d 156, 159 (Mo. banc 2012). This Court conducts its review in the light most favorable to the record

---

[4] McCall and Fleming did not file substitute briefs with this Court. The City and the Fund filed substitute briefs after this Court granted transfer. Pursuant to Rule 83.08(b), any material "included in the court of appeals brief that is not included in the substitute brief is abandoned." Therefore, any material, including arguments, that the City or the Fund did not include in their respective substitute briefs is abandoned.

8

and will find submission of an instruction proper "if the instruction is supported by any theory[.]" *Id.* "The party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to the party challenging the instruction." *Id.* This Court will reverse instructional errors "only if the error resulted in prejudice that materially affects the merits of the action." *Id.*

If a Missouri approved instruction (MAI) is applicable in a particular case, that instruction must be given "to the exclusion of any other instruction on the same subject." Rule 70.02(b). "Any deviation from an approved MAI instruction is presumed prejudicial error unless the contrary is shown." *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 813 (Mo. banc 2003). MAIs, however, do not exist for every particular legal issue. When there is no applicable MAI, the instruction given "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(b). Although McCall and Fleming's point relied on challenges the jury instructions submitted on both the City's nuisance claim and trespass claim, the authority on which McCall and Fleming rely addresses only the damages recoverable in a common law trespass action. McCall and Fleming do not cite any authority to support their claim that consequential damages are not recoverable in a common law nuisance action. "Where a party fails to support a contention with relevant authority or argument beyond conclusions, the point is considered abandoned." *Beatty v. State Tax Comm'n*, 912 S.W.2d 492, 498-99 (Mo. banc 1995). McCall and Fleming, therefore, abandoned their argument that the circuit court erroneously instructed the jury that consequential damages were recoverable under the City's nuisance claim. Because the jury was instructed on and

9

awarded consequential damages under the nuisance claim, no prejudice resulted from the trespass instruction also including the consequential damages language. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. banc 2010).

McCall and Fleming also assert that the circuit court improperly submitted damages instructions based on MAI 4.02 rather than MAI 4.01. McCall and Fleming, however, did not object to the instructions on such grounds. Rule 70.03 provides: "No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." The only objection raised by McCall and Fleming was that the language regarding consequential damages should not have been included in the instruction. In fact, McCall and Fleming modeled their instructions after MAI 4.02. Accordingly, because McCall and Fleming failed to make the specific objection to the instructions they are now claiming to be error, the issue is not preserved for appellate review. *See Howard v. City of Kansas City*, 332 S.W.3d 772, 790 (Mo. banc 2011).

McCall and Fleming further assert that the inclusion of the phrase "consequential damages" in instruction Nos. 7 and 9 gave the jury a "roving commission." "A roving commission occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury to roam freely through the evidence and choose any facts which suit its fancy or its perception of logic to impose liability." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010) (internal quotations omitted). In determining whether a jury instruction failed to give the jury meaningful guidance but, instead, constituted a roving commission, "[t]he issue is whether the phrase as used in the

10

verdict director was misleading in the context of the evidence at trial." *Id.* at 767. "Where the testimony in a case explains a phrase used in the verdict director, there is no 'roving commission.'" *Id.*

In this case, the testimony at trial made clear precisely what damages the City was seeking to collect as a result of the petroleum contamination. Dianna Wright, the City's former administrator, testified that the City was required to hire Midwest Remediation to install petroleum-resistant piping in the area where the contamination had been discovered because Rose-Lan was not qualified to deal with the petroleum contamination. Ms. Wright further explained that Midwest Remediation charged the City $155,257.98 more than Rose-Lan had contracted to charge for completion of the sewer upgrade project in the contaminated area. Ms. Wright testified that these additional costs were a direct result of the soil contamination. She also testified that the City incurred additional costs of $4,660 for soil testing to determine the scope of the contamination and $12,183 in additional fees to George Butler & Associates due to the increased scope of the sewer project caused by the soil contamination. Ms. Wright testified that the City's damages were the sum of these costs, $172,100.98, which directly resulted from the soil contamination.

Therefore, Ms. Wright's testimony establishes that the City incurred increased costs of $172,100.98 to complete the sewer upgrade project as a direct result of the contamination for which McCall and Fleming are responsible. None of the costs for which the City sought reimbursement would have been incurred had the City not encountered petroleum-contaminated soil. The increased costs to which Ms. Wright testified are the costs for which the City sought compensation in its closing arguments, and the jury

11

awarded the City compensatory damages in this precise amount. The City was entitled to recover these costs, which were proximately caused by the trespass of contaminants into the City's sewer easement. Under these circumstances, the reference to "consequential damages" in instruction Nos. 7 and 9 was sufficiently definite to inform the jury of the legal standard to be applied, and these instructions did not constitute a prohibited "roving commission."

McCall and Fleming also assert that instructions Nos. 7 and 9 were erroneous because the instructions allowed the City to seek recovery of "economic damages." In support of their argument, McCall and Fleming rely on the following exchange during Ms. Wright's cross-examination by their counsel:

> Q. ... So ... the difference in the money you paid [to Midwest Remediation] and the money that Rose-Lan said they would have spent, that represented the loss of the benefit of your good bargain with Rose-Lan; is that your understanding?
>
> A. That's my understanding.

McCall and Fleming claim that this exchange establishes that the City was seeking "benefit of the bargain" damages rather than recovery of only those costs that were directly attributable to the petroleum contamination.

By agreeing with McCall and Fleming's counsel that part of the City's damages reflected "the loss of the benefit of [the City's] good bargain with Rose-Lan," Ms. Wright was merely testifying that, due to the petroleum contamination, the City could no longer construct this portion of the sewer upgrade project at the lower costs to which Rose-Lan had agreed but, instead, had to hire a specialized contractor to perform part of the sewer

12

upgrade project at a much higher cost. Although McCall and Fleming's counsel asked his questions in terms of the "benefit of the bargain," Ms. Wright's response is consistent with the remainder of her testimony that the City could have had the relevant work performed at a much lower price but for the discovery of the contamination. The isolated excerpt from Ms. Wright's testimony, therefore, does not establish that the instructions permitted the City to seek "benefit of the bargain" damages.

## III. Competent Evidence Supports the Compensatory Damages Award

In their second point, McCall and Fleming argue that the circuit court abused its discretion by failing to sustain their motions for a directed verdict and for judgment notwithstanding the verdict, which sought to limit the City's compensatory damages to $72,009.89. McCall and Fleming argue that there was no competent evidence that the damages attributable to the contamination exceeded that amount.

"The standard of review for the denial of a judgment notwithstanding the verdict (JNOV) is essentially the same as review of the denial of a motion for directed verdict." *All Am. Painting, LLC v. Fin. Solutions & Assocs., Inc.*, 315 S.W.3d 719, 723 (Mo. banc 2010).

> When reviewing a circuit court's denial of a judgment notwithstanding the verdict, this Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability. Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences. This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion.

13

*Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013) (internal citation and quotation omitted).

McCall and Fleming claim that the only evidence on which the jury could have relied to determine the City's damages was the testimony of Mr. Thomas, who prepared Midwest Remediation's bid for the remediation project. Mr. Thomas testified that only $72,009.98 of Midwest Remediation's bid of $175,161.44 was directly attributable to the soil contamination at the site. This claim ignores the other evidence presented by the City to support its claim for damages.

Ms. Wright testified that all of the damages it was seeking to recover resulted from the necessity to hire Midwest Remediation to construct a portion of the sewer upgrade project that Rose-Lan was not qualified to perform because of the petroleum contamination. Furthermore, the City's evidence indicated that representatives of the Fund recommended Midwest Remediation and viewed its bid to install the petroleum-resistant pipes for $155,257.98 more than Rose-Lan's contract charged as "reasonable" for the work needed. Even if Mr. Thomas' testimony were viewed as inconsistent with the City's other evidence, any inconsistency was for the jury to resolve. Accordingly, viewing the evidence in the light most favorable to the verdict and disregarding any evidence to the contrary, the circuit court did not err in overruling McCall and Fleming's motion for directed verdict or motion for JNOV.

## IV. Remittitur of Compensatory Damages

In their third point, McCall and Fleming assert that the circuit court abused its discretion by not remitting the compensatory damages award based on Mr. Thomas's

14

testimony that Midwest Remediation's contamination-related costs were only $72,009.98. Because substantial evidence supported the jury's compensatory damage award, the circuit court did not abuse its discretion in refusing to remit the compensatory damages awarded against McCall and Fleming. *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39-40 (Mo. banc 2013).

## V. The Evidence Supports a Finding of Detrimental Reliance

On cross-appeal, counsel for the Fund asserts that the circuit court erred in overruling its motion for judgment notwithstanding the verdict because the City did not make a submissible case of fraud or negligent misrepresentation in that the City presented no evidence that it relied to its detriment on Mr. Vuchetich's representations. In fraudulent misrepresentation cases, the plaintiff is required to establish each and every element of a fraud claim, and its failure to do so is fatal to the claim. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988). An injury directly and proximately caused by the misrepresentation is an essential element of a fraudulent misrepresentation claim. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007).

Counsel for the Fund contends that the uncontroverted evidence shows that the City actually saved $30,000.00 by relying on Mr. Vuchetich's statements and hiring Midwest Remediation. Counsel argues that the City provided no proof that hiring Midwest Remediation resulted in costs to the City beyond those that the City was to incur if it did not hire Midwest Remediation. This argument, however, ignores that the City presented evidence that it would have acted differently if Mr. Vuchetich had not promised that the cost of Midwest Remediation's work would be paid from the Fund.

15

Ms. Wright testified that, based on Mr. Vuchetich's representations, the City left the April 2004 meeting with the understanding that the Fund's representatives wanted the City to hire Midwest Restoration and that the City would be reimbursed from the Fund for the costs of Midwest Remediation's work, less the amount that the City would have otherwise paid Rose-Lan for the same portion of the sewer project. As a result, the City authorized Rose-Lan to subcontract with Midwest Restoration for that portion of the sewer project. The City then paid Midwest Restoration for its work on the sewer project. Ultimately, however, the City was not reimbursed from the Fund for the costs of Midwest Remediation's work. Ms. Wright testified that, if she would have been told that the City would not be reimbursed from the Fund for all of the costs in excess of Rose-Lan's contract price, she would have told representatives of the Fund to "come and get your contaminated soil, and get it out of our easement, and completely remove it, clean it up, get a certification that it's now clean." Ms. Wright further testified that the City would then have had Rose-Lan complete the sewer installation as originally planned at no additional cost. Mr. Martin provided similar testimony. Testimony at trial reflected that the cost of excavation of all contaminated soils would have been approximately $500,000, for which the City claimed the Fund would have been responsible.

Based upon the proceeding facts, the City presented substantial evidence to allow the trier of fact to find that the City relied on Mr. Vuchetich's representations to its detriment in that the City incurred additional costs when it hired and paid Midwest Restoration to complete that portion of the sewer project that it otherwise would not have incurred had the City demanded representatives of the Fund remove all contaminated soil

16

for Rose-Lan to complete that portion of the sewer project as initially planned. The circuit court, therefore, did not err in overruling the Fund's motion for JNOV because the City presented sufficient evidence to support its fraudulent misrepresentation claim.[5]

## VI. The Punitive Damages Award against the Fund Was Erroneous

Counsel for the Fund further asserts that the circuit court erred in awarding punitive damages against the Fund.[6] More specifically, counsel asserts that section 319.131 provides no authority for the payment of punitive damages from the Fund.

---

[5] As discussed below, the City's claim, if any, was against the Fund's Board of Trustees for the misrepresentations of its agents.

[6] The claim of error raised in the second point relied on by counsel for the Fund is that the circuit court erred in submitting the punitive damages claim to the jury because section 319.131 governs payments from the Fund and authorizes payments only for participants' cleanup costs and third-parties' claims involving property damage or bodily injury and expressly precludes payment from the Fund of punitive damages. The separate opinions of Judge Fischer and Judge Teitelman would hold that counsel for the Fund failed to properly preserve this issue for appellate review by not raising the issue in a motion for a directed verdict or a motion for a JNOV. The separate opinions of Judge Fischer and Judge Teitelman raise these preservation issues *sua sponte*. None of the parties has questioned the preservation of this issue on appeal, and even the court of appeals reviewed this issue on the merits.

It is not necessary to review the procedural history of the case to determine whether the claim of error in the second point was timely made and preserved because this claim of error, although not labeled as such by counsel for the Fund, is a claim that the City failed to state a cause of action against the Fund for punitive damages. In other words, counsel for the Fund asserts that claims for cleanup costs and third-party property damage are the only cognizable claims authorized against the Fund and that any claims for payments beyond those authorized by statute are not cognizable against the Fund. Prior to 2012, the rules of this Court permitted the defense of failure to state a claim to be raised for the first time on appeal. Rule 55.27(g)(2) (2011) ("A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 55.01, or by motion for judgment on the pleadings, or at the trial on the merits, *or on appeal*.") (emphasis added). During trial and at the time counsel for the Fund appealed from the circuit court's judgment, the failure to state a claim still could be raised on appeal. *See Barlett by and through Barlett v. Kansas City S. Ry. Co.*, 854 S.W.2d 396, 399 (Mo.

17

The Fund is a statutorily created account. *See* section 319.129.1. Creatures of statute like the Fund can operate only in accordance with their enabling statutes. *See State ex rel. MoGas Pipeline, LLC v. Missouri Pub. Serv. Comm'n*, 366 S.W.3d 493, 496 (Mo. banc 2012). Section 319.131 speaks in terms of the Fund's liability. It outlines two instances in which the Fund provides coverage: (1) the Fund will pay all of its participants' cleanup "costs ... which are greater than ten thousand dollars but less than one million

---

banc 1993). Accordingly, the claim of error advanced on appeal that the City's claims against the Fund were not cognizable under section 319.131 is properly before this Court.

Moreover, contrary to the assertions made in the separate opinions of Judge Fischer and Judge Teitelman, this issue is not one that needs to be raised in a motion for directed verdict to be preserved for appellate review. Even though Rule 72.01, which governs motions for directed verdict and motions for JNOV, does not speak in terms of submissibility, a motion for directed verdict and a motion for judgment notwithstanding the verdict are legal terms of art with well-established meanings. A motion for directed verdict is defined as "[a] party's request that the court enter judgment in its favor before submitting the case to the jury because *there is no legally sufficient evidentiary foundation* on which a reasonable jury could find for the other party." *Black's Law Dictionary* 1170 (10th ed. 2014) (emphasis added). Likewise, a motion for JNOV is defined as "[a] party's request that the court enter a judgment in its favor despite the jury's contrary verdict because *there is no legally sufficient evidentiary basis* for a jury to find for the other party." *Id.* (emphasis added). Therefore, motions for directed verdict and motions for JNOV are intended to address whether there is a sufficient evidentiary basis to support a verdict, i.e., whether a submissible case has been made. This Court's jurisprudence provides that, in civil, jury-tried cases, it is necessary, "in order to preserve *the question of submissibility* for appellate review, to file a motion for directed verdict at the close of all evidence and to assign the error of the court in having failed to have directed such a verdict in an after-trial motion" such as a motion for a new trial or a motion for JNOV. *Ukman v. Hoover Motor Express Co.*, 269 S.W.2d 35, 36 (Mo. 1954) (emphasis added); *see also Millar v. Berg*, 316 S.W.2d 499, 502 (Mo. banc 1958). Questions of submissibility raised in a motion for JNOV, therefore, must have been raised in a motion for directed verdict to be preserved for appellate review. *See Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. banc 2012); *Howard*, 332 S.W.3d at 790; *see also Grippe v. Momttazee*, 696 S.W.2d 797, 798 (Mo. banc 1985). Because counsel for the Fund is not asserting that the City failed to make a submissible case as to punitive damages, the issue did not need to be raised in a motion for directed verdict to be preserved for this Court's review.

18

dollars per occurrence or two million dollars aggregate per year" and (2) the Fund "shall provide coverage for third-party claims involving property damage or bodily injury caused by leaking petroleum storage tanks whose owner or operator is participating in the fund at the time the release occurs or is discovered." *See* section 319.131.4; section 319.131.5. There is no authority for payment from the Fund for claims beyond those expressly articulated in section 319.131. Therefore, pursuant to its enabling statutes, the Fund is to be used for payment of its participants' cleanup costs and third-parties' claims involving property damage or bodily injury.

Here, the City's claims against the Fund did not fall within the statutorily authorized claims set out in section 319.131. Instead, the City sought and was awarded compensatory and punitive damages against the Fund for fraudulent and negligent misrepresentation made by representatives of the Fund. Under section 319.131, the Fund is not authorized to provide coverage for such claims as they do not constitute participants' cleanup costs or involve third-party claims for property damage or bodily injury. The tort claims alleged by the City, therefore, are beyond the coverage articulated in the Fund's enabling statutes. It follows, therefore, that the City's claims are not cognizable under section 319.131. *MoGas Pipeline,* 366 S.W.3d at 496.

Moreover, the statutory structure of the Fund is such that it cannot be liable for its own conduct. The City named the Fund as the defendant, but the Fund is merely an account within the state's treasury. Specifically, section 319.129.4 provides that the Board of Trustees is responsible for the "general administration of the fund" and the "proper operation of the fund, including all decisions relating to payments from the fund." Because

19

the Fund is merely an account within the state treasury, "it" cannot provide coverage, pay claims, or take any other action. Instead, some person or entity must be authorized to do these things *using* the Fund. Accordingly, section 319.129.4 provides: "The general administration of the fund and the responsibility for the proper operation of the fund, including all decisions relating to payments from the fund, are hereby vested in a board of trustees." The Board is a state agency, designated "a type III agency," and it has authority to "appoint an executive director and other employees as needed, who shall be state employees[.]" Section 319.129.8. The Board also "may select and employ, or may contract with, persons experienced in insurance underwriting, accounting, the servicing of claims and rate making, and legal counsel to defend third-party claims, who shall serve at the board's pleasure." Section 319.129.10.

Here, the City did not sue the Board or its members, employees, or contractors. Instead, it sued the Fund itself. There are no reported cases in which the Fund – as an entity – has sued or been sued. Instead, suits have been brought against the Board of Trustees, *see, e.g., Chouteau Dev. Co., LLC v. Sinclair Mktg., Inc.*, 200 S.W.3d 68 (Mo. App. 2006); *Rees Oil Co. & Rees Petroleum Products v. Dir. of Revenue*, 992 S.W.2d 354 (Mo. App. 1999), or the chair of the Board in his or her official capacity, *see, e.g., River Fleets, Inc. v. Creech*, 36 S.W.3d 809 (Mo. App. 2001); *River Fleets, Inc. v. Carter*, 990 S.W.2d 75 (Mo. App. 1999).[7] Because enabling statutes for the Fund vest the Board of Trustees with

---

[7] By the same token, suits seeking to recover damages from the Second Injury Fund are not brought against the fund itself. Instead, they are brought against the state treasurer, who is charged by section 287.220 with responsibility as custodian of the fund for issuing warrants for payment of covered claims as defined by applicable statutes. *See, e.g., Treasurer of*

20

the administration and the operation of the Fund, the Fund can do nothing to subject itself to the liability alleged by the City.

But even though counsel for the Fund initially moved to dismiss the City's claims on the very grounds that result in this Court vacating the award of punitive damages now, the Fund's counsel abandoned this argument on appeal with respect to the award of compensatory damages and seeks relief only from the award of punitive damages. Perhaps counsel for the Fund believed that the issue of compensatory damages was moot because, whether it paid "its own" compensatory damages judgment or paid the third-party claim against McCall, the cost to the Fund would be the same. Whatever the reason, however, the Fund does not seek relief on appeal in this Court from the judgment against it for compensatory damages, and this Court should not grant relief that is not sought.

Consequently, this Court does not disturb the compensatory award against the Fund. Nevertheless, because the City did not have had a cognizable claim against the Fund for actual or compensatory damages, it could not recover punitive damages from the Fund. *See Ellison v. Fry*, 437 S.W.3d 762, 777 (Mo. banc 2014). Accordingly, the punitive damages judgment against the Fund is reversed. By reversing the punitive damages award, however, an issue of fairness and justice arises because counsel for the Fund failed to raise the argument that the Fund's trustees – not the Fund itself – are the proper parties until after the jury rendered its verdict. This means that, when the issue finally was raised, the

---

*State-Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455 (Mo. banc 2013); *Pierson v. Treasurer of State,* 126 S.W.3d 386 (Mo. banc 2004).

21

City was not in a position to request leave to amend its petition to add or substitute parties. Yet, the allegations in the City's petition may state a cause of action against the Fund's Board of Trustees for the actions of its agents. Without expressing any opinion about the merits of the claims that may be asserted or the source for payment of any judgment against the Board on such claim, the furtherance of justice and fairness require that the cause be remanded to the circuit court. *See East v. McMenamy*, 266 S.W.2d 728, 732 (Mo. 1954) ("The furtherance of justice requires that a case should not be reversed without remanding unless the appellate court is convinced that the facts are such that a recovery cannot be had[.]").[8]

## VII. Conclusion

The judgment against McCall and Fleming is affirmed. The City, however, was not entitled to recover punitive damages from the Fund. Accordingly, the judgment is reversed with respect to the punitive damages awarded against the Fund. Nevertheless, this Court affirms the award of compensatory damages against the Fund because counsel for the Fund did not challenge the compensatory damages award on appeal. Additionally, because counsel for the Fund failed to raise the argument that the Fund's trustees – not the Fund itself – are the proper parties until after the jury rendered its verdict and because the allegations in the City's petition may state a cause of action against the Fund's Board of

---

[8] Counsel for the Fund raises two other points, and the City raises three points on appeal regarding the punitive damages awarded against the Fund. This Court need not address those points because the Court's opinion is dispositive of all issues raised regarding the Fund's liability for punitive damages.

22

Trustees for the actions of its agents, the cause is remanded in the interest of justice and

fairness.  The circuit court's judgment is affirmed in all other respects.

Breckenridge, C.J., Stith, Draper and Russell, JJ., concur;
Wilson, J., concurs in part in separate opinion filed;
Fischer, J., concurs in part and dissents in part in separate
opinion filed; Teitelman, J., concurs in part and dissents in
part in separate opinion filed.



# SUPREME COURT OF MISSOURI
## en banc

CITY OF HARRISONVILLE,    )
        )
     Appellant-Respondent,  )
        )
    v.        )     No. SC94115
        )
McCALL SERVICE STATIONS d/b/a  )
BIG TANK OIL, et al,    )
        )
     Respondent-Appellant,  )
        )
THE MISSOURI PETROLEUM  )
STORAGE TANK INSURANCE FUND,  )
        )
     Respondent-Appellant.  )

**OPINION CONCURRING IN PART**

I concur in the result reached in the opinion of the Court and in much of its reasoning. I write separately, however, to address the question of whether the defect in the judgment on which the Court's disposition of this case turns was (or was not) preserved for appellate review. The *per curiam* opinion holds that it was, and the dissenting opinion by Judge Fischer would hold it was not. In my view, whatever the relative merits of these arguments in other contexts, neither is relevant here.

Simply stated, the Missouri Petroleum Storage Tank Insurance Fund ("PSTIF") is not a legal entity. It is a thing. As a result, one cannot sue the PSTIF, and any judgment resulting from such a suit (i.e., a judgment purporting to determine the rights, interests,

and obligations of the PSTIF) is a nullity. It is no more valid than a judgment purporting to determine the rights, interests, and obligations of a "keg o' nails" or a bowl of soup. Whether such a defect is pointed out now or in the future (when, for instance, someone seeks to enforce that judgment) is immaterial because there is nothing to enforce.

On direct appeal, rules concerning preservation serve to limit the claims of trial court error that may be reviewed. Once such a claim is waived (either because a party failed to preserve it below or failed to pursue it on appeal) or the claim is passed upon and rejected by the appellate court, the judgment cannot be collaterally attacked on that basis. But such rules of preservation and abandonment have no impact on whether a judgment, on its face, is a nullity. To be sure, the particular type of fundamental defect present in this case is rare and, perhaps, *sui generis*. But it also is inescapable. Accordingly, I would hold that the Court has both the authority and the duty to identify and act upon such a fundamental defect regardless of whether or how it was raised below or on appeal.[1] In all other respects, I join the Court's opinion.

_____
Paul C. Wilson, Judge

---

[1] Because the judgment against the PSTIF is a nullity, the portion of that judgment purporting to hold "it" liable for compensatory damages is of no more effect than the portion purporting to hold "it" liable for punitive damages. Moreover, just as the Court's authority and duty to identify and act upon this defect does not depend upon a party "preserving" the issue below, it does not depend upon a party raising the issue here. Accordingly, even though I agree with the Court's opinion that vacating the judgment as to compensatory damages may have little practical effect, I would vacate the judgment against the PSTIF in its entirety.

2



# SUPREME COURT OF MISSOURI
## en banc

CITY OF HARRISONVILLE,          )
                                  )
        Appellant-Respondent,   )
                                  )
       v.                    )     No. SC94115
                                  )
McCALL SERVICE STATIONS d/b/a   )
BIG TANK OIL, et al.,          )
                                  )
        Respondent-Appellant,   )
                                  )
THE MISSOURI PETROLEUM     )
STORAGE TANK INSURANCE FUND,  )
                                  )
        Respondent-Appellant.   )

## OPINION CONCURRING IN PART AND DISSENTING IN PART

I respectfully dissent from Section VI of the per curiam opinion, which holds that § 319.131[1] prohibits the Fund from having liability for punitive damages and that this case should be remanded to the circuit court for substitution of the Fund's board as party defendant and a new trial.[2] It is perplexing that the per curiam opinion is willing to require the Fund to adhere to some of this Court's rules regarding preservation and presentment of issues for appellate review but not others.[3] Although not explained by the

---

[1] Statutory citations are to RSMo Supp. 2013, unless otherwise specified.
[2] I concur in Sections II through V of the per curiam opinion.
[3] The failure of the per curiam to follow some, but not all, of the rules regarding preservation of claims creates the conundrum expressed by Judge Teitelman's dissent. In doing so the per

per curiam opinion, this Court has jurisdiction of this case because it granted transfer after opinion by the court of appeals pursuant to article V, § 10 of the Missouri Constitution. Rule 83.08(b) permits the parties to file substitute briefs after transfer is granted but the parties are not permitted to "alter the basis of any claim that was raised in the court of appeals brief."

## I. The Fund Failed to Preserve Its Claims That It Was Statutorily Barred From Payment of Punitive Damages and That It Was the Incorrect Party Defendant

As a preliminary matter, the per curiam opinion neglects to restrain its review to the Fund's point on appeal, which states:

> **The trial court erred in failing to grant the Fund's motion for judgment notwithstanding the verdict** and set aside the jury's award of punitive damages, because the Fund is not subject to an award of punitive damages, in that no statute authorized the Fund to pay punitive damages awarded against the Fund itself, and § 319.131.5, RSMo, provides that the Fund shall not pay damages of an intangible nature or punitive damages awarded against insureds.

---

curiam opinion ignores or fails to recognize that a necessary condition to receive a punitive damage award is an award of compensatory damages against the same party. *See Tietjens v. Gen. Motors Corp.*, 418 S.W.2d 75, 88 (Mo. 1967). The per curiam opinion holds the Fund could not be liable for compensatory damages, but the per curiam opinion accepts that the Fund waived that claim by failing to include it in a point relied on in its brief. It should be equally apparent to the per curiam that the Fund does not include a point relied on that the City sued the wrong party or that the circuit court erred in overruling a motion for new trial on that basis. Further, in my view, the waiver by failure to present a claim in a point relied on in a brief is no more significant than the failure to properly present a claim in a motion for directed verdict and a motion for JNOV. As a result of the per curiam opinion, the City has a judgment for compensatory damages that six members of this Court affirm against the Fund, and therefore it is presumably collectable against the Fund. But the per curiam remands to the circuit court for the City to name a different party—the "Trustees" of the Fund from which to proceed to a retrial on the issue of punitive damages. To quote the per curiam, "this Court should not grant relief that is not sought." Per curiam op. at 21.

2

(Emphasis added).[4]  The Fund is not claiming that pursuant to Rule 55.27(g)(2) the City

failed to state a claim for fraud, which was the basis of the jury's verdict, but rather that it

has a legal defense to the payment of punitive damages.  Equally significant, in my view,

is that the Fund did not challenge the circuit court's decision to overrule its motion for

new trial; rather, it challenged the decision to overrule its motion for JNOV[5]—a point the

per curiam opinion acknowledges.  Nor does the Fund even suggest this argument was

included by reference or otherwise in its motion for JNOV.  This is an important

distinction because a motion for JNOV and a motion for new trial serve different

purposes.

> The motion for new trial is required to raise grounds that would entitle a party to a new trial. **As explained, an allegation that the court erred in failing to grant a new trial because the court should have granted a motion for a directed verdict at the close of all of the evidence does not state a ground for new trial. It only states a ground for judgment notwithstanding the verdict and must be raised in a motion seeking that relief and not in a motion for new trial.** A motion for new trial joined with a motion for judgment notwithstanding the verdict should raise issues of trial error which would constitute grounds for a new trial rather than grounds stating the pleader is entitled to judgment as a matter of law.

*Buttram v. Auto-Owners Mut. Ins. Co.*, 779 S.W.2d 1, 3 n.1 (Mo. App. 1989).  Critically,

according to the per curiam opinion's holding, the Fund is statutorily barred from the

---

[4] Note the Fund did not claim that it was the incorrect party defendant in the point on appeal, nor does it request a remand for a new trial on this point.

[5] I disagree with the per curiam opinion's conclusion in footnote 6 that *Ukman v. Hoover Motor Exp. Co.*, 269 S.W.2d 35 (Mo. 1954), stands for the proposition that **only** the question of submissibility has to be included in a motion for directed verdict at the close of evidence and in a motion for JNOV.  Nevertheless, current Rule 72.01(b), which has governed this issue since 1974, makes it crystal clear that a legal defense must have been made in a motion for directed verdict and after trial in a motion for judgment not withstanding the verdict.  Furthermore, there is no need for the per curiam to go to a secondary source like Black's Law Dictionary to determine what must be included in a motion for JNOV when Rule 72.01(b) makes it clear.

3

payment of punitive damages and is the incorrect party defendant for the City to have sued for fraud—neither of which can be properly remedied by a new trial.[6] Rather, these claims had to be presented in a motion for directed verdict and preserved for appellate review through a motion for JNOV. This Court's rules make it clear what is required to be in a motion for JNOV and motion for new trial and this Court should not now decide a case on a claim of error that is not properly preserved and briefed. Rule 72.01(a), (b), Rule 78.07, Rule 78.09, and Rule 84.13(a).

Even if this Court were to consider these claims properly presented in the Fund's points on appeal—an impossibility with regard to the substitution of a different party defendant—neither claim was properly preserved below. The per curiam opinion suggests that the Fund preserved for appellate review the argument that it is statutorily barred from payment of punitive damages, and that it was not the proper party defendant, only because the per curiam is willing to redraft and recast the arguments made by the Fund into a basic "[f]ailure to state a claim upon which relief can be granted" pursuant to Rule 55.27(a)(6). Per curiam op. at 17–18 n.6. Reliance and citation to this rule is not only absent from the Fund's brief, but it also is not included in any post-trial motion or even its motion to dismiss. The express motivation for mutating the Fund's point is so the per curiam opinion can conclude the argument is preserved because, at the time this case was tried, a claim that a petition failed to state a claim upon which relief could be granted

---

[6] "A new trial is available only when trial error or misconduct of the prevailing party incited prejudice in the jury." *Dodson v. Ferrara*, No. SC95151, Slip op. at 6 (Mo. banc Apr. 19, 2016). The Fund does not allege either basis is properly remedied by a new trial, but instead, of course claims that it is statutorily barred from the payment of punitive damages and request for a judgment to that effect.

4

could be raised for the first time on appeal.  This advocacy on the part of the per curiam,

which is searching for any way to resurrect the waived potential legal defense, neglects

the fact that the Fund raised completely different claims in its motion to dismiss than it

did in its motion for new trial, neither of which was the failure to state a claim upon

which relief can be granted.  The Fund's motion to dismiss expressly relied on Rule 52.06

(rather than Rule 55.27(a)(6)'s failure to state a claim) and challenged whether a direct

action could be brought against the Fund itself, instead of the Fund's board.[7]  This

argument was never pursued once the motion to dismiss was overruled, so it was waived.

The Fund's motion for new trial (not the motion for JNOV), however, argued that

§ 319.131.5 does not permit the Fund to pay an award of punitive damages.  These, of

course, are distinct claims and, if briefed, would be in separate points relied on.

Because I am not willing to engage in judicial advocacy by mutating the actual

claims made by the Fund to the circuit court or in its points on appeal, I am required to

analyze the claims made and points briefed to determine if they were properly preserved.

At the outset, it should be considered that:

> A motion to dismiss attacks the plaintiff's pleadings. . . . A motion to
> dismiss for failure to state a [claim] is solely a test of the adequacy of the
> plaintiff's petition.  It assumes that all of plaintiff's averments are true, and

---

[7] Paragraphs 2(e), 2(f), and 2(g) of the Fund's motion to dismiss provide:

> (e) The provisions of 100-5.030 do not provide for a direct action against the PSTIF.  Rather, the proper procedure for third-party claims calls for the fund participant to forward notice of any claim to the fund's board.  The board will then decide how to proceed.
>
> (f) 100-5.030(6) states that "the board has the right to defend any suit seeking property or bodily injury damages, and may investigate and settle any claim for third-party damages or suit at its sole discretion."
>
> (g) The Missouri Legislature, in 100-5.030(6), grants the board the *right* but not the *obligation* to defend suits against those covered by the fund.

liberally grants to plaintiff all reasonable inferences therefrom. No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. Instead, the petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case.

*Bosch v. St. Louis Healthcare Network*, 41 S.W.3d 462, 463–64 (Mo. banc 2001).

The Fund's motion to dismiss did not challenge the City's cause of action for fraud against the Fund nor did it allege § 319.131.5 provided an affirmative defense. See footnote 6. Rather, the Fund argued its board had the right but not the obligation to defend against the claim and therefore the proper procedure to forward notice of the claim to the board. Further, the Fund's motion for new trial (not the motion for JNOV) asserted for the first time a legal defense that it was statutorily barred from paying punitive damages to the City based on a claim of fraud.[8] Because this alleged defense is not a jurisdictional one, it was required to be raised as an affirmative defense or it is

---

[8] Paragraph 36 of the Fund's motion for new trial provides:
> 36. The Court should set aside the jury's verdict against PSTIF for punitive damages and order a new trial, said verdict being based on PSTIF's failure and refusal to pay the City's claim in full and the alleged delay associated therewith, as such verdict was against the substantial weight of the evidence. As it stands, the jury awarded substantial punitive damages against PSTIF, a state-created insurance fund, based on the Fund's failure to agree to pay a claim that it would not have paid as a matter of law under the controlling provisions of Missouri law, to-wit: Section 319.131(5), RSMo 2000, which statute prevents the fund from being responsible to third party claimants for other than the reasonable costs of containment and cleanup and which statute specifically prevents the fund from being responsible for economic and other intangible damages such as the loss of the City's benefit of their contractual bargain with Rose-Lan in the amount of approximately $100,000. As set out in 10 CSR 100-2.010(7), "'Cleanup' consists of all actions necessary to investigate, contain, control, analyze, treat, assess, remediate or monitor the effects of a petroleum release to standards established by the Department of Natural Resources."

6

deemed waived.[9] *McCracken v. Wal-Mart*, 298 S.W.3d 473, 476–79 (Mo. banc 2009) (holding § 287.040.1 of the worker's compensation law had to be asserted as an affirmative defense or it was deemed waived.)

The per curiam opinion concedes that its basis for reversing the punitive damages award and for remanding for substitution of the Fund as a party defendant were not made in a motion for directed verdict or in a motion for JNOV. In my view, the failure to present these purely legal issues in its motion for directed verdict and, after trial, in a motion for JNOV results in waiver of the argument. *See Sanders v. Ahmed*, 364 S.W.3d 195, 207–208 (Mo. banc 2012); *Howard v. City of Kansas City*, 332 S.W.3d 772, 790 (Mo. banc 2011). The Fund made two oral motions for directed verdict, one at the close of plaintiff's evidence and again at the close of all evidence, neither of which pertained to the Fund being statutorily barred from payment of punitive damages nor that it was an incorrect party defendant in the case.

In my view, the law regarding what is required to preserve an issue for appellate review is well settled.

As originally adopted, Rules 72.01 and 72.02[10] provided that the party who made a motion for directed verdict pursuant to Rule 72.01 could make a motion for JNOV in accordance with his motion for directed verdict.

---

[9] Why the Fund did not include a paragraph similar to Paragraph 36 in its motion for judgment notwithstanding the verdict is hard to say, but it could be that the Fund recognized it could not be included because it failed to present this legal defense in its answer, a motion to dismiss or even in its motion for directed verdict.

[10] **Motion for Directed Verdict.** The demurrer to the evidence and the request for peremptory instructions are abolished and in lieu thereof a party may make a

7

In 1974, when this Court reviewed these rules and reorganized them into what is currently Rules 72.01(a) and (b), and again when this Court later amended Rules 72.01(a) and (b), it decided to keep the text relevant to this requirement in place. Current Rule 72.01(b), in pertinent part, provides:

A party may move for a directed verdict at the close of all the evidence. **Whenever such motion is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a**

---

motion for a directed verdict. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. Upon motion for a directed verdict by a party opposing a claim the court, whether so requested or not, may dismiss the claim without prejudice if justice so requires.

Supreme Court Rule 72.01 (1959).

**Denial of motion for Directed Verdict—Motion to Set Aside Verdict, Judgment—Motion for New Trial.** Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within fifteen days after the reception of a verdict, **a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict**; or if a verdict was not returned, such party, within ten days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial. If the trial court sustains a motion for judgment in accordance with a directed verdict joined with a motion for new trial in the alternative, the trial court shall make and enter of record a ruling on the alternative motion for new trial to be effective if the ruling on the motion for judgment is reversed.

Supreme Court Rule 72.02 (1959).

8

**later determination of the legal questions raised by the motion**. Not later than thirty days after entry of judgment, **a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside** and to have **judgment entered in accordance with the motion for a directed verdict**[.]

(Emphasis added).

This well-settled law was recently reaffirmed in two of this Court's opinions:

In terms of preservation, a motion for directed verdict at the close of plaintiff's case is necessary only if defendant seeks to have the case determined at that point without introduction of additional evidence. Alternatively, if defendant chooses to put on evidence, the state of the record changes. The case then is decided on all of the evidence. **A motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue as it presented itself to the trial court at that time, prior to submission to the jury. After verdict, of course, a motion for JNOV also is required to preserve the issues raised for appeal.**

*Sanders*, 364 S.W.3d at 207–08 (emphasis added); *see also Howard*, 332 S.W.3d at 790 ("**[W]here an insufficient motion for directed verdict has been made, a subsequent post-verdict motion is without basis and preserves nothing for review.**") (Emphasis added).

Because the Fund failed to preserve its arguments that it was statutorily barred from payment of punitive damages, and that it was an incorrect party defendant, in its motions for directed verdict and in its motion for JNOV, these claims were waived and cannot properly be the basis of the per curiam opinion's reversal of the punitive damages award or remand for substitution of a party. While there are a plethora of cases following this well-settled law, defenses based on a statute must be included in motions for directed

9

verdict and later in a motion for JNOV. A recent example from the court of appeals is *Lewis v. Beigel*, 364 S.W.3d 670, 677 (Mo. App. 2012). In *Lewis*, the court held that a defendant who failed to raise a statute-of-limitations defense in her motion for directed verdict at the close of all evidence failed to preserve the issue for a motion for JNOV and appeal. *Id.*

In my view, because the Fund failed to present the purely legal defense that it was not authorized to pay punitive damages, or that it was the incorrect party defendant, to the circuit court in either motion for directed verdict, or a motion for JNOV, those claims were waived and therefore not preserved for appellate review.

## II. The City Failed to Preserve Its Argument That § 510.265.1(2) Violates Article I, Section 22(a) of the Missouri Constitution

The City also argued, to this Court, that § 510.265.1(2) violates the right to jury trial.

> To raise a constitutional challenge properly, the party must: (1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated, such as by explicit reference to the article and section or by quotation of the provision itself; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review. The purpose of this rule is to prevent surprise to the opposing party and permit the trial court an opportunity to fairly identify and rule on the issue.
> …
> It is well recognized that a party should not be entitled on appeal to claim error on the part of the trial court when the party did not call attention to the error at trial and did not give the court the opportunity to rule on the question. To give the court an opportunity to rule on the issue, a party must make a timely objection or request, which is one made when the occasion for the ruling desired first appears.

*Mayes v. Saint Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 266–67 (Mo. banc 2014) (internal citations and quotations omitted). Failure to do so constitutes a waiver of the

10

objection. The Fund argued for a reduction of the punitive damages award under § 510.265.1 in a post-trial motion. In response, the City argued that the statute could not be applied to its pre-enactment claim and that it was exempt from the statute because the City was "the state of Missouri" and, therefore, explicitly exempt from § 510.265.1's operation. At no time in the circuit court did the City argue § 510.265.1 was unconstitutional because it violated the City's right to a trial by jury, protected by article I, section 22(a) of the Missouri Constitution. By failing to challenge the constitutional validity of § 510.265.1 in the circuit court on this basis, the City failed to preserve the constitutional challenge for appellate review.

### III. Application of Punitive Damages Cap Does Not Violate Article I, Section 13 of the Missouri Constitution

The City argues the circuit court did not err in refusing to apply § 510.265.1(2) because it is a retrospective law. Section 510.265.1(2) provides that punitive damages are limited to the greater of $500,000 or five times the net amount of the damages awarded to the plaintiff. The General Assembly specified § 510.265.1's cap on punitive damages would apply to "all causes of action filed after August 28, 2005." Section 538.305.[11] The City filed its lawsuit in November 2005, after the punitive damages cap became effective. Therefore, § 510.265, the cap on punitive damages, is applicable unless application would violate a provision of the Missouri or United States Constitution. The circuit court held application of § 510.265.1 to this case violates article I, section 13 because the cause of action accrued before the statute became effective, but

---

[11] Sections 510.265 and 538.305 were both enacted as part of House Bill No. 393. *See* 2005 Mo. Laws 641, 647, 655.

reduced the award of punitive damages as excessive in violation of the Fund's due process rights.

No due process analysis is required in this case because the Fund is not a citizen and does not have due process rights. This is not a novel concept as it has been consistently recognized by this Court that the state and political subdivisions of the state, such as cities, are not entitled to the same constitutional protections as citizens. This Court has previously recognized in several respects that municipalities, like the City, do not have the same constitutional protections as citizens. *See City of Chesterfield v. Dir. of Revenue*, 811 S.W.2d 375, 377 (Mo. banc 1991) (holding municipalities are not "persons" and do not have due process or equal protection rights and noting this was a holding often repeated by both state and federal courts). Similar to our due process and equal protection clauses, the prohibition against laws retrospective in operation is contained in our state constitution's bill of rights.

Just as the Fund does not have due process rights, the City has no constitutional right to be free from a law retrospective in operation. This Court recently held:

> Our constitutional prohibition against laws retrospective in operation is located in our citizen bill of rights. "Because the retrospective law prohibition was intended to protect citizens and not the state, the legislature may constitutionally pass retrospective laws that waive the rights of the state." *Savannah R-III Sch. Dist. v. Pub. Sch. Ret. Sys. of Mo.*, 950 S.W.2d 854, 858 (Mo. banc 1997). By extension, the legislature may also waive or impair the vested rights of political subdivisions, such as cities, without violating the prohibition on retrospective laws. *Id.*; *see also Barton Cnty. v. Walser*, 47 Mo. 189, 205 (Mo. 1871). Therefore, the petition failed to state a permissible claim by a municipality pursuant to article I, §13 and the State was entitled to a dismissal of this claim.

12

*Mo. Mun. League v. State*, No. SC95337, Slip op. at 3-4 (Mo. banc May 24, 2016).[12]

The imposition of § 510.265 cannot be held unconstitutional as applied to the City because article I, section 13 of the Missouri Constitution only protects citizens against retrospective laws. Therefore, the statutory cap should be applied to reduce the jury's award to $860,504.90. *See* § 510.265.1(2).

_____
Zel M. Fischer, Judge

---

[12] Neither the circuit court nor the court of appeals had the benefit of this case when it was presented with this issue.



# SUPREME COURT OF MISSOURI
## en banc

CITY OF HARRISONVILLE,         )
)
        Appellant-Respondent,    )
)
   vs.                   )     No. SC94115
)
McCALL SERVICE STATIONS d/b/a   )
BIG TANK OIL, et al.,         )
)
        Respondent-Appellant,    )
)
THE MISSOURI PETROLEUM     )
STORAGE TANK INSURANCE FUND,  )
)
        Respondent-Appellant.    )

**OPINION CONCURRING IN PART AND DISSENTING IN PART**

I respectfully dissent from the per curiam opinion to the extent that it reverses the award of punitive damages against the fund and in favor of the City. Before explaining the basis of my disagreement, some context is in order.

As noted in the per curiam opinion, the City filed the underlying lawsuit in 2005. The City's suit included allegations that it incurred substantial cleanup costs in reliance on the Fund's fraudulent misrepresentation that the Fund would reimburse the City. After nearly a decade of litigation, the case proceeded to trial, and the jury awarded the City compensatory damages of approximately $172,000. The jury also awarded the City

punitive damages of $8 million against the Fund. The circuit court determined that the

punitive damage award was not subject to limitation pursuant to the punitive damage cap

set forth in section 510.265.1(2) [1] because the statute was enacted after the City's cause

of action accrued. The circuit court sustained the Fund's motion to remit the punitive

damage award to $2,500,000 on due process grounds.

### I. The City's suit against the Fund is not a nullity

The per curiam opinion concludes, erroneously in my view, that there is no

statutory authority for the payment of punitive damages from the Fund.[2] If there is no

statutory authority for the payment of punitive damages from the Fund, then the analysis

should end there. But it does not. Despite years of litigation, the per curiam opinion

asserts that the City's lawsuit against the Fund is, in effect, a nullity because the City

filed suit against the Fund rather than the Fund's board of trustees. The per curiam

opinion notes that the Fund is merely an account in the state treasury and, as such, is an

intangible "it" that "cannot provide coverage, pay claims, or take any other action."

Aside from the fact that this precise issue was not raised in a motion for directed verdict

or in the motion for a new trial and, therefore, is waived, an equally fundamental problem

is that hundreds of pages of record in this case demonstrate that, since this lawsuit was

commenced over a decade ago, the Fund – the "it" that is incapable of action – has

managed to retain counsel, answer the petition, file numerous motions and responsive

---

[1] All statutory citations are to RSMo Supp. 2006.

[2] I agree with Judge Fischer's conclusion that the issue of Fund's statutory authority to pay punitive damages was not preserved for appellate review.

pleadings, participate in discovery, litigate this case through the circuit court, the court of appeals and, ultimately, to this Court. Presumably, the Fund's board of trustees authorized this course of litigation just as it authorized the actions that form the basis of the City's lawsuit. Rather than holding that the City's damages and the Fund's vigorous defense over the last decade were nothing more than a legal mirage that no one else recognized until now, I would hold that the jury's verdict and the trial court's judgment were based firmly on real consequences caused by real actions undertaken by the Fund per its board of trustees.

## II. The affirmance of the compensatory damage award does not justify the reversal of the punitive damage award

After concluding that the City's lawsuit against the Fund amounts to nothing more than a suit against an account – an "it" that can take no action and incur no liability – the per curiam opinion doubles down on this conceptual quandary by affirming the award of compensatory damages and reversing the punitive damages because "the City should not have had a cognizable claim" against the Fund for compensatory damages after all. One would think that, by affirming the jury's award of compensatory damages, the per curiam opinion would similarly conclude that the award of punitive damages could be affirmed. That is not the case, however, because the per curiam opinion cites *Ellison v. Fry*, 437 S.W.3d 762 (Mo. banc 2014), for the proposition that its conclusion that the City should not have had a claim for compensatory damages means that the City was barred from recovering punitive damages. *Ellison* is exactly the opposite of this case.

3

In *Ellison*, this Court held, "Because this Court reverses the damage judgments against Defendants, Plaintiffs are entitled to no actual damages and the punitive damages issue is rendered moot." *Ellison*, 437 S.W.3d at 777. A case holding that the issue of punitive damages is moot when an award of compensatory damages is reversed does not establish that a punitive damage award must be reversed when an award of compensatory damages is affirmed. If *Ellison* is relevant at all, it supports the converse proposition that, when compensatory damages are affirmed, the award of punitive damages can also be affirmed.

### III. The Fund is statutorily authorized to pay punitive damages

Having determined that the City has filed a real lawsuit against a real defendant for real damages, the issue then becomes whether the City's claims for actual and punitive damages are barred by the Fund's enabling statutes. The per curiam opinion asserts that section 319.131 "speaks in terms of the Fund's liability" and limits the Fund to "coverage" of its participants' cleanup costs and third-parties' claims involving property damage or bodily injury. The per curiam opinion concludes, therefore, that the tort claims alleged by the City are "beyond the coverage" authorized by the Fund's enabling statutes.

The per curiam opinion's rationale conflates the insurance "coverage" the Fund provides pursuant to section 319.131 with the Fund's "liability" for its own actions. By characterizing section 319.131 as defining the Fund's "liability," the per curiam opinion has reframed what section 319.131 actually says. Section 319.131 outlines the Fund's obligation to provide insurance "coverage" for cleanup costs and claims for property

4

damage or bodily injury caused by leaking petroleum storage tanks. *See* sections 319.131.4-5. While section 319.131.5 does prohibit compensation for "loss or damage of an intangible nature, including . . . punitive damages," this limitation applies to the Fund's payment of property damage or bodily injury claims "caused by leaking petroleum storage tanks" insured by the Fund. There is simply no language in section 319.131.5 defining or limiting the Fund's liability for its own actions. Given the lack of any statutory text immunizing the Fund from liability for its own actions, I would not hold that Fund is free to engage in fraud and misrepresentation with impunity.

## IV. The punitive damage cap does not apply

As the circuit court determined and the jury found, the Fund is liable for punitive damages. Section 538.305 provides that the section 510.265 cap on punitive damages applies to "all causes of action filed after August 28, 2005." The City filed its lawsuit in November 2005, after the punitive damages cap became effective. Nonetheless, the circuit court correctly declined to apply section 510.265 because retroactively limiting the City's damages after the City's cause of action accrued violates article I, section 13 of the Missouri Constitution.

Article I, section 13 provides that "no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges or immunities, can be enacted." The plain language of article I, section 13 provides that no law "retrospective in its operation . . . can be enacted." The plain meaning of this language is that the General Assembly is barred, without exception, from enacting any retrospective laws.

5

Despite the self-evident, plain meaning of article I, section 13, barring the General Assembly from enacting retrospective laws, this Court has held that the ban on retrospective laws does not mean what it says and, instead, permits the legislature to enact some retrospective laws so long as those laws retroactively change the legal rights of the state or a state-created entity.   For instance, in *Barton County v. Walser*, 47 Mo. 189, 205 (Mo. 1871), this Court held that a county could not successfully challenge a statute pursuant to article I, section 13 because "[n]o vested right of a citizen is interfered with."  Similarly, in *Savannah R-II Sch. Dist. v. Pub. Sch. Ret. Sys. of Mo*., 950 S.W.2d 854, 858 (Mo. banc 1997), the Court held that a school district could not challenge a statute pursuant to article I, section 13 because the ban on retrospective laws "was intended to protect citizens and not the state" and, as a result, "the legislature may constitutionally pass laws that waive the rights of the state" as well the rights of "instrumentalities of the state established by statute …."  The net result of the *Barton County* rationale is that article I, section 13 has been judicially amended from "no laws retrospective in operation … can be enacted" to "some retrospective laws in operation …. can be enacted."  These cases are inconsistent with the plain and simple text of article I, section 13 and should no longer be followed.  The section 510.265 cap on punitive damages does not apply to this case because retroactively limiting the City's damages after the City's cause of action accrued violates article I, section 13 ban on the enactment of retrospective laws.

V. The Fund is not entitled to remittitur of the punitive damage award

Although the circuit court correctly declined to apply the punitive damage cap, the court erred in remitting the punitive damage award to $2.5 million on due process grounds. The Missouri Constitution, article I, section 10 provides "[t]hat no person shall be deprived of life, liberty or property without due process of law." The Fifth Amendment of the United States Constitution provides: "No person shall be . . . deprived of life, liberty, or property, without due process of law[.]" The Fund is not a person and, therefore, does not have due process rights. *See State ex rel. Brentwood Sch. Dist. V. State Tax Comm'n*, 589 S.W.2d 613, 615 (Mo. banc 1979). Accordingly, the punitive damage award could not be remitted on due process grounds.

I would reverse the circuit court judgment to the extent that it remits the punitive damage award from $8 million to $2.5 million. I would affirm the remainder of the judgment.

_____
Richard B. Teitelman, Judge

7